Stacy G. Hall
#38608
South Dakota State Penitentiary
P.O. Box 5911
Sioux Falls, SD 57117-5911

**JUL 13 2016**

Clerk, U.S. Courts
District of Montana
Helena Division

Plaintiff, pro-se

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

\*\*\*\*

| | |
|---|---|
| STACY G. HALL, ) | CV _____ |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | |
| ) | |
| BUDDY MYOTTE, ALVIN FODE, ) | |
| TRISDAN KOHUT, P.A. FISK, ) | |
| MARK HENDERSON, JANE ) | |
| McMAHON, PAMELA WARD ) | |
| MONACO, LESLIE THORNTON, ) | |
| ROSANNA HENGST, DAN ) | |
| CURRAN, GUTHERIE LEWIS, ) | **VERIFIED COMPLAINT** |
| LANCE GRIFFIN, SAMANTHA ) | **FOR DAMAGES** |
| PETERSON, HIEDI ABBOTT, ) | |
| CYNDY HINER, CATHY ) | (Jury trial demanded) |
| REDFERN, MICHAEL ZUBER, ) | |
| MYRON BEESON, TOM WOOD, ) | |
| LEROY KIRKEGARD, JANE ) | |
| LAMOURE, MIKE BATISTA, E. ) | |
| SHANE SPEARS, JONATHAN ) | |
| PINE, STEPHEN POWELL, and ) | |
| VARIOUS UNKNOWN DOE'S, sued ) | |
| in their individual capacities, ) | |
| ) | |
| Defendants. ) | |

This is a civil rights action filed by Stacy G. Hall, a state prisoner being held

1

in the custody and care of the Montana Department of Corrections, for money

damages under 42 U.S.C. §1983, alleging deliberate indifference or callous

disregard for health and safety from dangerous working conditions proscribed by

the Eighth Amendment to the United States Constitution, by ordering plaintiff to

clean human feces smeared onto the walls and ceiling of several maximum security

prison cells previously occupied by a mentally deranged inmate, without

hazardous-material handling and clean-up training, protective gear, or proper

cleaning supplies and equipment necessary to reach high places, resulting in a fall

that broke plaintiff's right shoulder; followed by deliberate indifference to serious

medical needs through the unnecessary and wanton infliction of pain and suffering,

proscribed by the Eighth Amendment to the United States Constitution, resulting

from: (1) denial or delay of access to treatment after emergency room medical

professionals determined that the plaintiff had a broken shoulder and ordered

plaintiff to be referred to an orthopedic specialist as soon as possible, but which the

defendants delayed by two days (followed by an additional delay of six days noted

below); (2) interference with and the denial or delay of access to treatment after

prison personnel refused to allow an orthopedic specialist to conduct a CT or CAT

scan, after the specialist indicated that the same was necessary to further diagnose

the plaintiff's injuries, until approval of cost could be made by the prison medical

department, resulting in an additional delay of six days; (3) denial, delay, and/or

2

failure to provide the physical therapy recommended by an orthopedic specialist, obtained by the defendants to care for the plaintiff, by waiting until the plaintiff's shoulder began to freeze up; (4) deliberate replacement of professionally assisted physical therapy, as ordered by an orthopedic specialist, with self-administered physical therapy using alternative instructions given by a non-specialist, resulting in additional permanent injury to plaintiff's shoulder; (5) failure to inquire further into, and treat, plaintiff's severe pain associated with his shoulder injury; (6) repeated delays by the prison doctor seeing the plaintiff because the plaintiff was complaining and filing grievances; (7) intentionally interfering with treatment by prison security staff, causing the plaintiff to miss treatment on several occasions; (8) denial of access to exercise equipment needed for physical therapy; (9) gratuitous interruptions in the administration of pain medication causing severe pain and withdraw; and (10) deliberate failure to inquired into essential facts or perform additional tests necessary to make a professional judgment regarding complications being suffered to plaintiff's injuries, due to the level of care he was receiving, thus resulting in late diagnoses of ruptured tendons in the plaintiff's shoulder – making it too late to repair or treat. The plaintiff further alleges the torts of negligence under Mont. Code Ann. §2-9-101, et seq., because of serious bodily injury resulting from a custodial failure to take reasonable care to insure the health and safety of a prisoner, by intentionally refusing to provide adequate

training for hazardous-material custodial clean-up work and protective gear, and safe equipment with which to work; and medical malpractice under Mont. Code Ann. §27-6-103(5) for negligent acts and omissions during diagnosis and treatment which contributed to additional injuries and caused a recovery that is of lesser extent or quality and that took longer to occur.

## I. JURISDICTION AND STANDING

1.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 in that this is a civil action arising under the Constitution of the United States.

2.  Jurisdiction of this Court is also invoked pursuant to 28 U.S.C. §1343(a)(3) in that this action seeks to redress the deprivation, under color of state law, of rights secured by Acts of Congress for equal rights secured by persons within the jurisdiction of the United States.

3.  This Court may accept supplemental jurisdiction over the plaintiff's state law tort claims under 28 U.S.C. §1367 in that they arise from the same facts.

## II. PARTIES

4.  The Plaintiff, STACY G. HALL ("Hall"), at all times relevant to the events giving rise to this complaint, was incarcerated at the Montana State Prison ("MSP"), which is administered by the Montana Department of Corrections ("MDOC"), and located in Deer Lodge, Montana.

5.  Defendant BUDDY MYOTTE, at all times relevant to this complaint, was

4

Sergeant of Locked Housing Unit Two at MSP and employed by the state of Montana. He is sued in his individual capacity.

6. Defendant ALVIN FODE, at all times relevant to this complaint, was Unit Manager of Locked Housing Unit Two at MSP and employed by the state of Montana. He is sued in his individual capacity.

7. Defendant TRISDAN KOHUT, at all times relevant to this complaint, was Physician at MSP and employed by the state of Montana. He is sued in his individual capacity.

8. Defendant P.A. FISK (full name not known at this time), at all times relevant to this complaint, was Physician Assistant at MSP and employed by the state of Montana. She is sued in her individual capacity.

9. Defendant MARK HENDERSON, at all times relevant to this complaint, was employed by the State of Montana as a health care Physician Assistant at MSP. He is sued in his individual capacity.

10. Defendant JANE McMAHON, at all times relevant to this complaint, was employed by the State of Montana as a health care service personnel at MSP. She is sued in her individual capacity.

11. Defendant PAMELA WARD MONACO, at all times relevant to this complaint, was employed by the State of Montana as a health care Registered Nurse at MSP. She is sued in her individual capacity.

12. Defendant LESLIE THORNTON, at all times relevant to this complaint, was employed by the State of Montana as a health care Registered Nurse at MSP. She is sued in her individual capacity.

13. Defendant ROSANNA HENGST, at all times relevant to this complaint, was employed by the State of Montana as a health care Licensed Practical Nurse at MSP. She is sued in her individual capacity.

14. Defendant DAN CURRAN, at all times relevant to this complaint, was employed by the State of Montana as a health care Registered Nurse at MSP. He is sued in his individual capacity.

15. Defendant GUTHERIE LEWIS, at all times relevant to this complaint, was employed by the State of Montana as a health care Physician Assistant at MSP. She is sued in her individual capacity.

16. Defendant LANCE GRIFFIN, at all times relevant to this complaint, was employed by the State of Montana as a health care Physician Assistant at MSP. He is sued in his individual capacity.

17. Defendant SAMANTHA PETERSON, at all times relevant to this complaint, was employed by the State of Montana as a health care service personnel at MSP. She is sued in her individual capacity.

18. Defendant HIEDI ABBOTT, at all times relevant to this complaint, was employed by the State of Montana as an Assistant Director of Nursing at

MSP. She is sued in her individual capacity.

19. Defendant CYNDY HINER, at all times relevant to this complaint, was employed by the State of Montana as Director of Nursing at MSP. She is sued in her individual capacity.

20. Defendant CATHY REDFERN, at all times relevant to this complaint, was employed by the State of Montana as Medical/Mental Health Unit Bureau Chief at MSP. She is sued in her individual capacity.

21. Defendant MICHAEL ZUBER, at all times relevant to this complaint, was employed by the State of Montana as Captain of Security at MSP. He is sued in his individual capacity.

22. Defendant MYRON BEESON, at all times relevant to this complaint, was employed by the State of Montana as Associate Warden of Housing at MSP. He is sued in his individual capacity.

23. Defendant LEROY KIRKEGARD, at all times relevant to this complaint, was employed by the State of Montana as Warden of MSP. He is sued in his individual capacity.

24. Defendant JANE LAMOURE, at all times relevant to this complaint, was employed by the State of Montana as Administrative Assistant to the Director of the Department of Corrections. She is sued in her individual capacity.

25. Defendant MIKE BATISTA, at all times relevant to this complaint, was employed by the State of Montana as Director of the Montana Department of Corrections. He is sued in his individual capacity.

26. Defendant E. SHANE SPEARS, at all times relevant to this complaint, was employed as a Physical Therapist at Premier Physical Therapy located in Deer Lodge, Montana, and provided medical services to state prison inmates under contract with MSP. He is sued in his individual capacity.

27. Defendant JONATHAN PINE, at all times relevant to this complaint, was employed as Orthopedic Surgeon at Pintler Surgical Specialists located in Anaconda, Montana, and provided medical services to state prison inmates under contract with MSP. He is sued in his individual capacity.

28. Defendant STEPHEN POWELL, at all times relevant to this complaint, was employed as Orthopedic Surgeon at Northern Rockies Orthopedics located in Missoula, Montana, and provided medical services to state prison inmates under contract with MSP. He is sued in his individual capacity.

29. Defendants VARIOUS UNKNOWN DOE'S, at all times relevant to this complaint, was employed at MSP and held various positions as medical personnel at the prison infirmary. They are sued in their individual capacities.

30. All of the defendants at all times relevant to this complaint acted under color

8

of state law.

## III. EXHAUSTION OF AVAILABLE REMEDIES

31.    Plaintiff has exhausted his administrative remedies at Montana State Prison

and with the Montana Department of Corrections.  Further, pursuant to

Mont. Code Ann., §2-9-301, Hall did file an administrative claim with the

Montana Department of Administration over his state law tort claims.  As to

Hall's medical malpractice claims, pursuant to Mont. Code Ann., §27-6-

105(2), he is exempt from any prerequisite administrative review or

exhaustion requirement which may deny the Court subject matter

jurisdiction over prisoner medical malpractice claims.

## IV. FACTUAL STATEMENT

32.    In the year 2013, Hall was incarcerated at MSP and being housed in Locked

Housing Unit Two ("LHU-2").

33.    On January 17, 2013, Hall was assigned as an Inmate Unit Worker in LHU-2

to perform general custodial duties on the main floor of the unit.

34.    Hall duties included sweeping and mopping hallways, the officer's break

room, Sergeant's office and staff bathrooms; cleaning the officer's break

room, unit lobby and entrance area; restocking paper towel dispensers;

washing state and personal laundry as needed; swamping housing dayrooms,

showers, and empty cells on housing blocks A, C, and H; making PHC

hygiene kits and clothing rolls as needed; removing laundry; removing garbage from the offices and bathrooms; cleaning and organizing the laundry room, filling the laundry cart for 2nd shift; sorting, folding, and putting away incoming laundry; cleaning retherm (meal tray cooker/heater) and assisting in making meal trays; emptying all meal trays for return to the kitchen; cleanings windows, walls, and food carts daily; as well as spray buffing the hallways.

35.   It is the understanding and belief of Hall, as told to him by defendants Buddy Myotte and Alvin Fode, that it is the policy and practice at MSP that inmate workers must be trained and certified in the safety precautions and handling procedures for hazardous-materials ("Haz-Mat") before they can be used to perform Haz-Mat clean-up duties.

36.   It is the understanding and belief of Hall, for the reason stated in ¶35 above, that MSP employs a special Haz-Mat crew of trained and certified inmates to perform Haz-Mat clean-up duties within the prison.

37.   It is the understanding and belief of Hall that all inmates at MSP, whether employed or not, must obey all orders and instructions written and spoken by prison staff or face disciplinary action in accordance to MSP Procedure No. 3.4.1, Rule 4213, "Refusing to immediately obey a verbal 'direct' order/command from any staff member."

38.  All inmates at MSP assigned to a work duty program must report to duty when expected, accept all program assignments, and perform assigned work duties commanded of them by prison staff or face disciplinary action in accordance to MSP Procedure No. 3.4.1, Rule 4300, "Refusing to work, report to work, or accept a program assignment;" or Rule 4314, "Failing to perform work or verbal instructions as directed by a staff member."

39.  Inmates at MSP who receive disciplinary sanctions face termination of their work program assignment for failing to maintain clear conduct, in violation of the terms and conditions of the work program assignment contract and/or agreement.

40.  Unreasonable or objectionable orders, instruction, or conduct and practices upon inmates at MSP by prison staff may only be addressed through the Inmate Grievance Procedure in place at MSP.

41.  During all times relevant to this complaint, Hall and his co-worker, Curtis Klatt ("Klatt"), were employed as unit workers in Locked Housing Unit Two ("LHU-2") at MSP to perform general custodial duties within the housing unit.

42.  At no time while assigned as a unit worker in LHU-2 at MSP did Hall receive any training, instruction, or certification in Haz-Mat clean-up duties or handling procedures.

43. Beginning in May of 2013, Defendants Alvin Fode ("Fode") and Buddy
    Myotte ("Myotte") began to make exceptions to the policy and practice of
    using the MSP Low Side Haz-Mat work crew to clean blood and fecal matter
    from contaminated cells within LHU-2, by instead instructing Hall and Klatt
    to perform the Haz-Mat clean-up work details in their place.

44. After defendants Fode and Myotte began making exceptions to the Haz-Mat
    policy and practice, by using Hall and Klatt to perform Haz-Mat clean-up
    duties within LHU-2 without Hall (and Klatt) having any training or
    certification, both Hall and Klatt began to make repeated requests to receive
    Haz-Mat training, certification, and bonus pay.

45. After defendants Fode and Myotte continued to make exceptions to the Haz-
    Mat policy and practice, and Hall and Klatt's requests for training and
    certification remained unanswered, when Hall pressed Defendant Fode on the
    issue, Fode told Hall and Klatt that he discussed the issue with Defendant
    Myron Beeson ("Beeson") and that the decision was made that the unit
    workers in LHU-2 (that being Hall and Klatt) will not be receiving Haz-Mat
    training, certification, or bonus pay because MSP already has a Haz-Mat crew.

46. There are no ladders, stepping stools, or scaffolding available in LHU-2 for
    use by inmate unit workers to provide them with a proper and safe means to
    reach high places for cleaning; such as tall windows, upper portions of walls

that are not within reach, ceilings, etc.

47. When Hall approached defendants Myotte and Fode related to the acquisition of stepping ladders to reach high places, both stated the issue required approval from Associate Wardens Beeson and Tom Wood ("Wood").

48. Some time after making the request noted in ¶47 above, Hall checked back with defendants Fode and Myotte about acquiring stepping ladders to reach high places for cleaning. Both Fode and Myotte replied by claiming that Associate Wardens Beeson and Wood stated that the issue presents a security risk and will not be provided for that reason.

49. When Hall asked Fode and Myotte what equipment was available to enable him and his co-worker (Klatt) to clean in high places both stated to Hall that he may use chairs and the rolling table already available in the unit (for cleaning on the main floor), and the fixtures in the cells (concrete bed slab, desk, and metal sink/toilet) for cleaning in high places within the cells.

50. During the month of June 2013, two inmates on H-Block in LHU-2 at MSP often smeared their feces all over the walls and windows of their cells. When this activity first started, defendants Fode and Myotte called the Low-Side Haz-Mat work crew into the unit to clean the cells after each incident.

51. After a time of having to call the Low-Side Haz-Mat work crew into LHU-2 each time an inmate smeared fecal matter in his cell, and the inconveniences

associated with security by having to call the Low Side Haz-Mat workers into the unit, defendants Fode and Myotte began to leave the feces smeared cells unattended for days at a time before cleaning. This practice caused the fecal matter to dry, harden, and accumulate making it much more difficult to remove and clean.

52. On Saturday, July 6, 2013, after moving all inmates off H-Block in LHU-2 at MSP, Defendant Myotte called in the Low Side Haz-Mat work crew to clean three (3) cells that were covered with dry feces.

53. The Haz-Mat clean-up crew consisted of three (3) inmates from the Low Security Compound of Montana State Prison; identified as Ricky Ward, Dean May, and Don Schults.

54. Upon Hall's experience over the course of his job assignment as a unit worker within LHU-2, and through his observations while being housed in LHU-2 for the months and year prior, it was/is the custom and normal practice of the Low Side Haz-Mat work crew to arrive in LHU-2 with their own supply of cleaning brushes, mop heads, and solvents – so as not to contaminate the unit worker's equipment.

55. When the Low Side Haz-Mat work crew arrived in LHU-2 on Saturday, July 6, 2013, they did not bring any cleaning equipment, supplies, or protective gear with them for reasons unknown to Hall.

14

56. After the Low Side Haz-Mat work crew was locked onto H-Block Defendant Myotte called upon Hall and Klatt to equip the crew with brooms, mops, rags, towels, scrub brushes, squeegees, and cleaning solvents.

57. Just prior to July 6, 2013, Fode explained to Hall that LHU-2 was under a budget freeze and unable to re-supply bleach and disinfectant solvents for the unit. Because no bleach was available in the unit at the time, Hall and Klatt were only able to supply the Low Side Haz-Mat work crew with all purpose cleaner/deodorizer solvents used for general cleaning.

58. Due to the amount of fecal matter that was spread over the walls, with globs having been packed behind the bed, desk, and in the crevices of each of the three (3) cells, much of which had dried, and the lack of disinfectant solvents, Defendant Myotte instructed the Low Side Haz-Mat work crew to clean as much as possible in the limited time available and explained that he will use his unit workers (Hall and Klatt) to complete the work on the following day.

59. Defendant Myotte stated to Hall and Klatt that he will check with the other housing units to get some bleach and disinfectant solvents, so they can finish the work and sanitize the cells.

60. On the morning of Sunday, July 7, 2013, Defendant Myotte had bleach and disinfectant solvent packs delivered to LHU-2 from High Side Unit Two and instructed Hall and Klatt to finish the clean-up work that the Low Side Haz-

Mat work crew was unable to complete.

61. Prior to performing the assigned clean-up duty noted in ¶60 above, Hall and his co-worker Klatt had surveyed the cells on H-Block to determine what cleaning supplies will be needed and the extent of the contamination to be cleaned.

62. After inspection, having found a substantial amount of fecal matter still remaining in the crevices of the walls, smeared on the inside of the cell doors, globs packed behind the desk and bed, and a substantial amount smeared on the ceiling of one cell, Hall and Klatt had determined that all of the unit's cleaning equipment will be needed and that it will be necessary to soak the cells with warm water to moisten the fecal matter for easier removal and cleaning.

63. Hall and Klatt reported their inspection, the extent of the clean-up effort, and the needed equipment to complete the job to Defendant Myotte. They also requested a chair for use inside the cells, a large garbage barrel to fill with warm water and cleaning solvents to soak the cells, and protective Haz-Mat gear to protect against exposure to human fecal matter.

64. Defendant Myotte approved all of Hall and Klatt's equipment requests for use on H-Black except for the protective Haz-Mat gear, stating that the gear was

not necessary since they would get a change of clothing and a shower after the work was completed.

65. After Defendant Myotte denied the request for protective Haz-Mat gear, Klatt requested if he and Hall could use the face mask shields located in the unit's supply closet to protect their eyes from contaminated water splashes. Defendant Myotte denied the request stating that the shields were for officer use only.

66. Hall and Klatt were then locked in H-Block to begin the necessary clean-up work.

67. While Hall and Klatt were locked on H-Block, which at the time had been used as a high control security detention block to house hard to manage and mentally ill inmates, direct supervision was provided by Defendant Myotte and the correctional officers working in the unit through regular observations and check-ins, and continuous video surveillance from the control cage.

68. After soaking one of the cells, that had fecal matter spread over the ceiling, the contaminated water began to drip down onto Hall and Klatt. To clear the ceiling of dripping water Hall attempted to modify a squeegee pole by wrapping a towel around the squeegee bar to scrub the ceiling, but that failed.

69. At one point Hall and Klatt began to use the fixtures in the cell, such as the

cement slab used for a bed, the desk, and all-in-one sink and toilet to reach the ceiling for cleaning. As noted in ¶49 above, this practice was the instruction of the defendants for reaching high places in the cells.

70. While standing on the desk Hall slipped on water and fell onto the floor. The impact of the fall injured Hall's right shoulder.

71. Immediately after Hall was injured, Myotte called the prison Command Post and medical care unit ("Infirmary") to report to the injury.

72. Within 30 minutes after being injured, Myotte escorted Hall to the prison Infirmary.

73. Upon arrival at the prison Infirmary, Hall was seen by attending medical personnel.

74. After consulting with Hall, who reported the symptoms of his injury, a determination was made to transport him to the Deer Lodge Community Medical Center ("DLCMC"), located in the city of Deer Lodge, Montana, for further evaluation.

75. To the best of Hall's memory and belief, it took approximately 45 minutes to an hour from the time of his arrival at the prison Infirmary before he was transported to the DLCMC.

76. While at the DLCMC, X-Rays were taken of Hall's right shoulder.

18

77. The X-Rays revealed that Hall suffered a comminuted (shattered), three part fracture involving the right proximal humerus, horizontal component involving the surgical neck, and vertical component involving the greater tuberosity. The X-Rays further showed a large fracture fragment containing the greater tuberosity measuring 4.4 x 2.0 cm. The greater tuberosity fracture showed itself to be mildly displaced.

78. After X-Rays showed that Hall had suffered a significant injury to his right shoulder, the attending medical practitioner at the DLCMC placed his right arm in an immobilizer and sling.

79. After the DLCMC medical practitioner immobilized Hall's right arm, she explained the significance of the injury sustained and stressed that Hall is not to move his right arm or remove the immobilizer or arm sling for any reason.

80. During consultation, the attending medical practitioner informed Hall that there is not an orthopedic surgeon or qualified specialist at the hospital to see him at that time and for that reason, there is nothing more that the DLCMC could do for him.

81. The attending medical practitioner then informed the accompanying MSP transportation officers that Hall needs to be seen by an orthopedic surgeon as soon as possible.

82. The injury to Hall's shoulder caused him great pain and suffering. The attending medical practitioner at DLCMC advised Hall that he was being prescribed Loratab, a powerful pain reliever, for the treatment of pain.

83. The attending medical practitioner at DLCMC also advised Hall that due to policy, only the medical personnel at MSP can administer the medication and that he will have to wait for treatment until he is returned to MSP.

84. Hall was then discharged from DLCMC and returned to MSP by the transportation officers.

85. When Hall was returned to MSP he was immediately taken to the prison Infirmary where he was met by Defendant Samantha Peterson ("Peterson") , a Registered Nurse ("RN") employed at MSP. RN Peterson repeated instructions to Hall that he not move his right arm or remove the immobilizer or arm sling for any reason.

86. RN Peterson next offered Hall a dosage of Tramadol to help with pain. To the best of Hall's knowledge and belief, he was prescribed Loratab for pain by DLCMC and not Tramadol.

87. Shortly after being returned to his prison cell in Locked Housing Unit Two ("LHU-2"), Hall was notified that he was placed on a medical lay-in and restricted from participating in all program activities (including work detail).

20

88.     Hall is a non-drug or alcohol user with no history of abuse. Due to low
        tolerance and a fear of being in an altered state of mind, Hall commonly
        resists medications unless absolutely necessary and only under conditions of
        extreme pain and suffering or when required to sustain life.

89.     Within three (3) hours after being returned to his housing unit Hall began to
        complain of severe, intolerable pain and requested medical care. Hall
        complained the Tramadol that RN Peterson administered was not having any
        effect on his pain and suffering.

90.     After complaining, unit staff reported to Hall that they had contacted the
        Infirmary who explained that he is scheduled to receive pain medication
        (Tramadol) once every 12 hours and that there is nothing more they can do
        for him until pill pass.

91.     After Hall continued to complain unit staff, sympathetic of his suffering,
        began to supply him with over-the-counter Ibuprofen, 100 mg tablets, for the
        remainder of the day and until the PM pill pass.

92.     Over the course of the following days Hall continued to complain that
        the pain medication was not easing his severe pain and that he was losing
        sleep and appetite. Each of the attending nurses stated there is nothing they
        could do to help, but that Hall was scheduled to see an orthopedic specialist
        soon.

93.   On the following Tuesday, July 9, 2013, Hall was transported to Pintler Surgical Specialists at 305 West Pennsylvania, Anaconda, Montana, where he was seen by Orthopedic Specialist Dr. Jonathan Pine ("Dr. Pine").

94.   Dr. Pine reviewed the X-Rays taken by DLCMC with Hall and explained that he will need corrective surgery.

95.   Dr. Pine then went on to explain that prior to surgery he wanted a CAT scan taken to enable him to see areas of the impacted bone not visible in the X-Rays taken at DLCMC.  He then instructed his staff to ready the radiologist.

96.   The secretary for Pintler Surgical Specialists raised the question whether or not approval of costs for the CAT scan needed to be obtained from MSP before the scan can be taken.

97.   The accompanying MSP transportation officers offered to call MSP's medical department to ask whether approval was needed for the scan, which they did.

98.   After calling, the officers reported that MSP's medical department denied the request by claiming that approval needed to be obtained to cover the cost of the scan and that the staff responsible were not available by reason that they were in a meeting.

99.   In response to the officers' report, which Hall personally witnessed, Dr. Pine stated to the officers that his radiologist was ready and that he did not want

to wait ten days.  He asked if the officers would call again.

100.  The officers obliged and called MSP who again denied the request.  The

officers also reported to Dr. Pine and Hall that they were ordered to return

him to the prison at that time.

101.  Upon information and belief, MSP's Dr. Trisdan Kohut was the party who

denied Dr. Pine's request and ordered Hall's return to MSP (see ¶107

below).

102.  Dr. Pine then sent with the officer's his request for a CAT scan to be

performed that week, the week beginning July 8, 2013, and that Hall be

returned to his office as soon as possible.

103.  On July 10, 2013, Myotte took the plaintiff to the LHU-2 pilot medical exam

room to see defendant Dr. Trisdan Kohut ("Dr. Kohut") for an unscheduled

visit related to Hall's injury and the associated severe pain.

104.  Prior to Hall's July 10, 2013, visit with Dr. Kohut, he was not seen by any

physician at MSP.

105.  Because Hall's visit was unscheduled, Dr. Kohut did not have his medical

file on hand.  During the visit Dr. Kohut further explained to Hall that he had

not seen his X-rays, any reports related to his injury, and that his only

knowledge was that Hall had broken his shoulder.

106.  Dr. Kohut then asked Hall what can he do for him.  Hall explained that he

had broken his right shoulder and was suffering from severe pain.  Hall also

explained that he was taken to see a specialist, Dr. Pine, and further told of

the situation related to the CAT scan as described in ¶¶95-100 above.

107.   Defendant Dr. Kohut stated that he did not approve the CAT scan because

that kind of expenditure requires paper work that goes through a three-stage

approval process.

108.   Hall complained that Dr. Pine wanted the CAT scan right away and did not

to want to wait 10 days.  Hall also complained that he is aware that

significant injuries need immediate care and that the longer the wait the

greater likelihood of unwarranted complications.

109.   Defendant Dr. Kohut replied to Hall by stating that things do not work that

way, as related to ¶¶95-100 above, and stated that emergency treatment is

only provided in cases of near death.

110.   Hall then noticed Defendant Dr. Kohut's demeanor becoming short

tempered and contentious.

111.   Defendant Dr. Kohut then looked over a list of inmates who were receiving

medications under direct supervision and found Hall's name.  He then stated

to Hall that he was going to take him off pain medications.

112.   Hall immediately lost his composure and turned to Buddy Myotte,

commenting that he cannot believe that he is being taken off pain

medications while he is in severe pain with a broken shoulder.

113.   Hall, while moving towards Buddy Myotte to exit the exam room, asked
       Myotte to take him back to his cell and stated that he wanted to initiate an
       emergency grievance.

114.   Sergeant Myotte then put his hand out to stop Hall and told him to hold up a
       minute and settle down. Hall was visibly distraught.

115.   Correctional Officer James Bailey then entered the exam room in a
       heightened state of alert.

116.   Sergeant Myotte then told defendant Dr. Kohut that Hall is his best
       worker who broke his shoulder while working for him and that he brought
       him out to be seen to get help for pain.

117.   Defendant Dr. Kohut then went on a tantrum about how he is the only
       physician on hand with all these problems inmates are having and the he
       cannot manage it all alone.

118.   Correctional Officer James Bailey then spoke up and stated that everyone
       needs to calm down and that there is a person here in severe pain who needs
       help.

119.   Defendant Dr. Kohut agreed and apologized. He stated stress got to him.

120.   Hall apologized and stated he is in severe pain and that his knowledge of
       rumors about Dr. Kohut's wicked cruelty towards inmate suffering

contributed to his anxiety and frustration.

121.   Defendant Dr. Kohut then stated that he was not aware of the full extent of
Hall's injuries but that there is no doubt he is in great pain.

122.   Defendant Dr. Kohut then stated had Hall allowed him to continue without
the outburst, he was going to say that he was going to change his medication
from Loratab, twice daily, to Tramadol three times daily and add Tylenol
600 mg.  Defendant Dr. Kohut went further to explain that Hall will be
receiving Tramadol at 4:00 am, 12:00 pm, and again at 4:00 pm and Tylenol
at 8:00 pm and 12:00 am, for 10 days.

123.   Hall then informed Defendant Dr. Kohut that he was never given Loratab
and is already being given Tramadol once every 12 hours at 4:00 am and
4:00 pm, and that the medication is not working.  Dr. Kohut stated to Hall
that that cannot be and Hall said it was true.  The meeting ended and Hall
was then escorted back to his cell.

124.   On July 11, 2013, Hall was taken to DLCMC where a CAT scan was taken
as previously ordered by Dr. Pine.

125.   On July 15, 2013, eight days after Hall's injury was sustained and six days
after Dr. Pine ordered the CAT scan, Hall was returned to Pintler Surgical
Specialist in Anaconda, Montana, where he was seen by specialist Dr.
Jonathan Pine.

126.   The purpose of the appointment with Dr. Pine was to review the results of
the CAT scan and to go over the course of treatment that was being
recommended.

127.   When Dr. Pine attempted to review the CAT scan images with Hall the
computer reported the file as being "invalid" and would not render the
images. The computer then crashed. Incidentally, Dr. Pine was not able to
review the images with Hall.

128.   Dr. Pine then explained to Hall his injuries in terms that Hall could
understand. He explained that the outer ball of the humeral head showed a
significant fracture and was slightly offset, as if the ball had almost been
sheared off. He described the injury as very unusual and complicated.

129.   Dr. Pine then explained his concern that the offset portion of the fracture
will catch onto the acromion and severely restrict movement, where Hall
will never be able to lift his right arm above his shoulder or outward to the
side without experiencing pain and complications in the Acromioclavicular
joint.

130.   Dr. Pine next explained that the ball of the humeral head is smashed into the
bone and that the area around the impaction is shattered.

131.   Dr. Pine went further to explain that in order to correct the complications
surgery would be necessary to lift the ball and re-align the fracture. He also

explained that he will need to insert metal and screws to hold the humeral head together.

132.    Dr. Pine then explained that while surgery is warranted he is concerned that if he reset the fracture and lifted the impacted ball it would cut-off blood supply to the humeral head and require future corrective surgery. He stated he did not want to risk putting in a bunch of metal and screws only to have to take them out within two years and repeat the process.

133.    For the reason stated in ¶132 above, Dr. Pine opined that surgery at this time would do more harm than good but added that it would eventually be needed.

134.    When Hall asked if the delay by MSP contributed to his prognoses, Dr. Pine stated that he is not going to comment on that issue. He stated his only concern is what can be done from now forward to promote recovery.

135.    Dr. Pine then explained to Hall the course of treatment he was prescribing. He explained to Hall that he is to maintain complete immobilization of his right arm for two more weeks (until the week of July 29, 2013), then begin a course of gentle range of motion physical therapy, assisted by a specialist, for three weeks (or until the week of August 19, 2013) before being returned to his office for re-evaluation.

136.    Dr. Pine explained the purpose and importance of physical therapy was

necessary to prevent the impacted bone tissue from fusing in the shoulder, to prevent the shoulder from freezing up, and to maximize range of motion while scar tissue was still soft. He opined that since the humeral head had shattered there would be significant scaring and tissue growth in the shoulder.

137.    Dr. Pine concluded by stating that the outcome of physical therapy will determine further treatment options.

138.    On July 19, 2013, Hall was briefly seen by prison physician Dr. Piranian who merely confirmed that Hall's shoulder was broken, that he is under the specialty care of Dr. Pine, and that physical therapy was prescribed as the course of treatment. Dr. Piranian did not conduct any exam or evaluation of his own.

139.    On July 23, 2013, Hall was taken to Premier Physical Therapy of Deer Lodge, Montana, where he was seen by E. Shane Spears, MPT ("Mr. Spears"). While meeting with Mr. Spears, who reported to Hall he had little information about his injury and the course of treatment being recommended, Hall explained that Dr. Pine ordered he remain in the immobilizer until the week starting July 29, 2013, and that assisted gentle range of motion by a physical therapy specialist was not to begin until that time. Mr. Spears confirmed the order, cancelled the appointment, and Hall

was returned to the prison at that time.

140.    On August 1, 2013, after MSP failed to begin physical therapy on the
        schedule prescribed by Dr. Pine, Hall submitted an institutional Health Care
        Request ("kite") to the MSP Infirmary asking why physical therapy had not
        started.  In the kite, Hall also warned the Infirmary of the risks of any delay
        that Dr. Pine had explained during consultation.  Defendant Jane McMahon
        replied on August 2, 2013, by stating that physical therapy was ordered for
        "after" July 29th and that it has been scheduled.

141.    On August 5, 2013, Hall was returned to Premier Physical Therapy.  The
        visit was one week later than prescribed by Dr. Pine.  At this appointment,
        physical therapy did begin, during which Mr. Spears spent 30 minutes
        administering gentle range of motion exercises.  During the exercises, Mr.
        Spears provided full support of Hall's arm and shoulder.  Hall complained of
        severe pain and discomfort.

142.    During the session Hall attempted to hold conversation with Mr. Spears, to
        take his mind off pain.  Mr. Spears was mostly uninterested in Hall's
        conversation and directed his attention more towards the attending
        transportation officers.  This had chilled Hall's conversations and made him
        feel like he was not welcome.

143.    During the entire session, Mr. Spears did not offer any explanation as to

what kind of therapy was being performed, or any instructions for Hall to follow on his own. At the end of the session, Hall asked Mr. Spears how many sessions were scheduled. Mr. Spears stated that he was scheduled for only one session.

144. Concerned MSP would not schedule further physical therapy; Hall asked Mr. Spears if it is normal that clients only attend one session with his kind of injury. Mr. Spears stated that it is not normal and usually requires 3 to 5 months of physical therapy.

145. Hall then asked Mr. Spears for instructions in the event he is not returned for future sessions. Mr. Spears advised Hall to repeat the same kind of motions he performed on him with the assistance of a nurse. Mr. Spears did not offer any further instruction or provide any additional information or instructional reading material.

146. The motions performed on Hall by Mr. Spears consisted of his holding Hall's shoulder with one hand and while Hall's arm is bent at the elbow, slightly pulling downward at the elbow while very slowly and gently turning his arm from side to side (from hand to body to hand to facing forward); then, with his arm straightened at the elbow, gently moving his arm upward until parallel to his shoulder and back again; then, with his arm still straightened, gently moving his arm outward from the side of Hall's body

and back again. During all three motions, Mr. Spears was slightly but firmly
pulling on Hall's arm at the same time to relieve pressure in the shoulder.

147. When Hall expressed to Mr. Spears that he is unable to move his arm on his
own and that even any kind of slight movement causes severe pain, Mr.
Spears stated that that is why he should get the assistance of a nurse.

148. When Hall asked Mr. Spears about the immobilizer and arm sling, Mr.
Spears instructed that he continue their use until instructed otherwise by a
doctor.

149. As Hall was leaving, he requested a copy of the paper work that Mr. Spears
was sending back to MSP with the notes Hall witnessed Mr. Spears writing
but which he was not allowed to read. Mr. Spears denied the request and
stated that the plaintiff can obtain copies from the prison. Mr. Spears stated
to Hall that as an inmate he does not have a right to any information about
his treatment and that he will need to consult with the prison's medical
personnel about any questions or concerns. Hall was then returned to MSP.

150. After being returned to MSP, concerned about Mr. Spears attitude towards
the right of Hall to his medical information, right to informed consent, and
right of participation in medical decisions, Hall executed a durable power of
attorney for health care and medical treatment naming his mother, Mrs.
Velva Hall, as his agent.

151. The next day after being seen by Mr. Spears, on August 6, 2013, Hall sent a kite to the Infirmary complaining that he is unable to move his arm on his own to perform any of the gentle range of motions performed on him by Mr. Spears during physical therapy. Hall also complained that he is unable to provide his arm with support as Mr. Spears did and that he experiences extreme pain when he attempts to move his arm. Hall requested assistance by prison medical staff.

152. On August 6, 2013, Hall was still in the immobilizer and arm sling as required of him.

153. After receiving Hall's medical kite of August 6, 2013, an unknown nurse attempted to meet with him to conduct an evaluation. However, Sergeant Buddy Myotte interfered by refusing to allow medical staff in to see him.

154. On the following day, August 7, 2013, Defendant Registered Nurse Pamela Ward Monaco ("RN Monaco"), was allowed to see Hall related to his August 6, 2013, kite. Defendant RN Monaco denied Hall's request by stating that he (Hall) is not the only inmate at MSP, there are not enough medical staff to help inmates with personal therapy, and told Hall that he needs to learn how to perform physical therapy on his own in his cell.

155. When Hall complained that it is impossible for him to perform physical therapy on himself and that he experiences severe spikes in pain whenever

33

he attempts to move his arm even slightly, Defendant RN Monaco stated the best she can do is refer him to the prison doctor.

156.    On August 8, 2013, Hall filed his durable power of attorney for health care and medical treatment with MSP's Records Department and Infirmary. Hall's agent also faxed a copy to Pintler Surgical Specialists and Premier Physical Therapy.

157.    After filing the power of attorney, Hall's agent began making calls to MSP, Pintler Surgical Specialists, and Premier Physical Therapy to gather information related to his medical condition and treatment.

158.    Mr. Spears of Premier Physical Therapy refused to acknowledge Hall's power of attorney and denied his agent access to the medical information related to his medical care and the treatment being administered.

159.    On August 12, 2013, Hall was seen by prison general practitioner Defendant Dr. Kohut, who asked Hall what his problem was.

160.    After Hall explained the findings and course of treatment described to him by Dr. Pine, his encounter with Mr. Spears at Premier Physical Therapy, the importance of physical therapy as described to him by Dr. Pine, the need for assistance with the exercises that Mr. Spears performed on him, that he could not move his arm even slightly on his own, Dr. Kohut stated that MSP does not provide physical therapy for inmates and that medical staff only

provide assistance to inmates in life or death situations. Defendant Dr. Kohut then asked Hall if he was dieing.

161. When Hall answered by stating that he is not dieing, Defendant Dr. Kohut denied the request for assistance by stating that his staff are not there to baby inmates and have more important things to do. He then asked Hall what was so hard about the exercises.

162. After Hall explained that he is unable to move his arm on his own and unable to support it as the physical therapist did, unable to slightly pull on his arm while gently moving it in the range of motions as performed on him by the therapist, and complained of extreme spikes in pain when ever he attempted to move his arm even slightly, and the increased swelling and what appears to be significant bleeding under the skin that is seeping down his arm from his shoulder to his elbow, Defendant Dr. Kohut stated that it is obvious what ever he is doing is wrong.

163. At this time, it was plainly apparent that Hall's skin was black, purple, blue, red, and pink throughout the entire region of his right shoulder, and extending down his right arm to his elbow.

164. When Hall stated that he is only relying on the advice given to him by two specialists (an orthopedic surgeon and physical therapist) and that the nature and significance of his injury is unique, as described by Dr. Pine, Defendant

Dr. Kohut stated that he did not see the X-Rays but did read the description

of the X-Rays taken at DLCMC and will order more X-Rays for his review.

165.   Defendant Dr. Kohut then stated to Hall that he himself had broken his

shoulder in the past in 16 different locations and knows what his therapist

did for him. He then stated that he was going to show Hall three exercises

that his physical therapist had him perform. He then stated to Hall, "Let me

try to remember. Oh, yes! Like this…" Defendant Dr. Kohut then

demonstrated three isolated exercises where he used his wrist to apply

pressure against the wall.

166.   After the demonstration, Defendant Dr. Kohut stated to Hall that he wanted

him to do the exercises on his own in place of the range of motion exercises

ordered by Dr. Pine and that Hall will not need assistance by staff.

167.   When Hall stated that Dr. Pine wanted him to do gentle range of motion

therapy assisted by a physical therapist, Defendant Dr. Kohut ordered him to

do what he showed him to do and that additional exercises will be explored

later in time.

168.   Hall then complained about the increased swelling that he was experiencing

since the injury, what appears to be significant internal bleeding traveling

down his arm and pooling into his right elbow, and increased pain.

Defendant Dr. Kohut refused to conduct any examination and simply stated

36

that the conditions will eventually go away as he heals. Defendant Dr.
Kohut stated that the exercises he showed him should not cause as much
agitation because they entail little range of motion and will help strengthen
muscle tissue.

169.   When Hall asked Defendant Dr. Kohut if he will address the issue related to
pain and explained that his current medication scheme was not working,
Defendant Dr. Kohut plainly stated that he does not treat inmates for pain
and that no changes will be made. He stated to Hall that if needed he can
ask staff for over the counter Tylenol or purchase it from the canteen if he
has money.

170.   On August 14, 2013, plaintiff was taken to DLCMC where a second set of
X-Rays were taken. Plaintiff was never scheduled to hear an explanation of
the results and Defendant Dr. Kohut gave none.

171.   On August 15, 2013, Hall sent a kite to the Infirmary complaining of
significant internal bleeding that was pooling under the skin and traveling
down to his right elbow, and spreading into his right chest area and across
his back area along his right shoulder blade. Hall also complained of
increased severe pain that spiked during the isolated pressure exercises that
Defendant Dr. Kohut ordered in place of the assisted range of motion
exercises prescribed by specialist Dr. Pine and as demonstrated by Physical

37

Therapist Mr. Spears.

172.    Also on August 15, 2013, in a separate kite to the Infirmary, Hall

complained that the pain medication Defendant Dr. Kohut prescribed

(Tramadol) stopped working and detailed the severe pain levels as being

intolerable, preventing sleep and that when he is able to sleep the pain wakes

him up.  Hall also reported that due to his pain levels he is experiencing

nausea and is unable to eat.  Hall noted over 12 lbs. loss in body weight from

145 lbs. to 133 lbs.

173.    On August 16, 2013, Hall was seen by Defendant Registered Nurse Leslie

Thornton ("RN Thornton") in response to the kites noted in ¶¶171 and 172

above.

174.    Defendant RN Thornton also noted the appearance of substantial swelling

and blackened skin from Hall's elbow to his shoulder, spreading into the

right pectoral area of his chest and across the shoulder blade in Hall's back.

175.    Hall was not seen again by any medical staff until August 21, 2013, six days

after he complained of the server complications noted in ¶¶171-173 above.

At that time, Hall was seen by Defendant Physician Assistant Fisk ("PA

Fisk").  Defendant PA Fisk, after hearing Hall's description of his condition,

warned Hall not to complain.  She stated to Hall that if he begins to

complain too much or bug medical staff about his condition, be

disrespectful, argue, file grievances, question the doctor, mention lawyers, law suits, or contact the ACLU he will be stonewalled by MSP's medical staff, responses slow-played, and the level of care and treatment will be reduced to a bare minimum.  Defendant PA Fisk stated she was only trying to be helpful by offering advice based on her experience and knowledge of how the doctor and most MSP medical staff feel about inmates and their medical needs.

176. When Hall asked if his current condition will be treated Defendant PA Fisk stated that she can only make recommendations to Defendant Dr. Kohut and that whatever level of treatment Hall will be provided is basically up to him.

177. Defendant PA Fisk also stated that she had not seen the X-Rays but from reading specialist Dr. Pine's description she understood that Hall's injury is unusual and significant, and that there is no doubt he is suffering great pain.

178. Defendant PA Fisk then opined that the current medication may be insufficient.

179. Defendant PA Fisk next stated that the doctor does not like to prescribe pain medications to inmates but that she will explain to her supervisors the significance of Hall's condition and recommend changes in pain management.

180. Defendant PA Fisk next addressed Hall's condition with weight loss and

nausea. With regard to the issue of weight loss, Defendant PA Fisk stated that MSP does not treat inmates for weight loss and for that reason; the issue will not be addressed. She stated that she will, however, recommend medication for nausea.

181.   Defendant PA Fisk then instructed Hall to submit a medical kite requesting a second opinion. When Hall explained he had already made the request and that it was promptly denied, she asked Hall resubmit and noted that this time the result will be different. She instructed Hall to keep the wording of the request simple and suggested that it state that he had injured his shoulder, would like a second opinion, and if no second opinion is granted to please provide the reason why.

182.   Defendant PA Fisk concluded the meeting by stating that she is scheduling a follow-up in a week to check the status of her recommendations and Hall's condition.

183.   On August 21, 2013, Hall submitted a medical kite requesting a second opinion as Defendant PA Fisk instructed.

184.   On August 26, 2013, Defendant Hiedi Abbott denied Hall's August 21, 2013, request (as noted in ¶183 above). In her denial she wrote, "You have been seen by multiple MSP providers as well as an orthopedic physician and a physical therapist. Comply with the current treatment plan." (Hall was

seen by a medical professional at DLCMC as described at ¶¶78-83.  He was then seen by Defendant RN Peterson as described at ¶¶85-86; Defendant Dr. Kohut as described at ¶¶103-123; Dr. Piranian as described at ¶138; and again by Defendant Dr. Kohut as described at ¶¶158-168.  Hall was also seen by two outside specialists, the first being Orthopedic Specialist Dr. Pine as described at ¶¶93-102 and ¶¶125-137; and the second being Physical Therapist Mr. Spears as described at ¶139 and ¶¶141-148).

185.   On August 22, 2013, Hall submitted a medical kite complaining about pain and nausea and asked if adjustments are being made as PA Fisk explained in her August 21, 2013, assessment (as noted above in ¶175-182).  An unknown medical personnel responded on August 23, 2013, by stating that no changes were made and that PA Fisk stated that she was going to check with other providers for a plan of care.

186.   On August 23, 2013, Hall also filed a grievance complaining that he is suffering from severe pain and nausea, and that he believes the level of care he is receiving is inadequate.  The grievance was denied by Defendant Hiedi Abbott on September 11, 2013, and again denied by Defendant Cindy Hiner on September 23, 2013; Hall appealed, which too was denied by Defendant Cathy Redfern on October 21, 2013, then again by Defendant Jane LaMoure on November 7, 2013.

187.    On August 26, 2013, the medical lay-in related to Hall's shoulder injury had expired. Hall submitted a medical kite asking if his medical lay-in will be renewed. On August 27, 2013, an unknown medical responder replied by stating that Hall's medical status had been changed to normal.

188.    Also on August 26, 2013, due to confusion and the conflicting instructions given by Orthopedic Specialist Dr. Pine and Physical Therapy Specialist Mr. Spears to that of prison doctor Defendant Dr. Kohut, Hall sent a medical kite requesting to know what his treatment plain actually consisted of.

189.    On September 5, 2013, Defendant Hiedi Abbott responded to Hall's August 26, 2013, medical kite by writing, "Participate in Range of Motion 4x daily as instructed by physical therapy. Do on your own. Elbow, wrist & hand exercises on your own as instructed by physical therapy. You will be followed up by both MSP providers as well as a specialist."

190.    The instructions written by Defendant Hiedi Abbott conflicted with those given by all three previous health care providers. (See description of Dr. Pine's instruction at ¶135; the description of Mr. Spears' instructions at ¶¶145-147; and the description of Defendant Dr. Kohut's description at ¶¶165-166.)

191.    Hall affirmatively states that the instructions written by Defendant Hiedi Abbott in ¶189 above, and given by Defendant Dr. Kohut in ¶¶165-166, are

not the instructions given or shown to him by physical therapist Mr. Spears
(see ¶¶145-147).

192. On August 28, 2013, Hall was seen by Defendant PA Fisk for a follow-up as
she previously promised. She explained any adjustment in pain management
was denied but would not disclose by whom. She also explained that Hall's
weight loss will not be addressed, and that MSP medical has decided that it
will seek a second opinion after all.

193. On August 29, 2013, Hall sent a medical kite complaining of the
complications he was suffering in his right shoulder. He described his
problem as "scraping, things are moving around like a rubber band snapping,
things are crunching, I get sharp piercing pain when I move towards the
limits where my injury prevents any further movement, and there is a lot of
PAIN."

194. The limits in range of motion of Hall's shoulder on August 29, 2013, was
movement in approximately two feet in any direction from the arm being in
the extended downward position. When performing these movements, Hall
used his left hand to support his right arm to minimize the conditions he
explained in ¶193 above.

195. On September 5, 2013, Defendant Hiedi Abbott responded to Hall's August
29, 2013, medical kite by merely referring to his August 28, 2013, meeting

43

with PA Fisk.  At that meeting, PA Fisk reported to Hall that she was unable to achieve her recommendations for increased care and treatment to more adequate levels.  The only change achieved was prescription medication to help with nausea.  No action was taken to address the more serious issues related to increased pain and the worsening of complications related to Hall's condition.

196.    On August 29, 2013, later in the day as Hall's pain level began to spike, he again complained to a nurse visiting the unit on regular rounds.  The nurse instructed Hall to submit another kit.  Hall did as told and complained that something was terribly wrong with his shoulder and that MSP medical staff were refusing to address his worsening condition.  Hall complained that the pain medication (Tramadol twice daily) was not working.

197.    Hall complained that he is beginning to feel like he is better off dead.

198.    Also on August 29, 2013, Hall submitted a grievance complaining that he is being denied a second opinion and left to suffer permanent damages to his shoulder.  Hall also complained of pain and denial of proper care, the failure to monitor his worsening condition, and deliberate indifference to his serious medical condition.  The grievance was requesting re-evaluation of his condition by an orthopedic specialist and a second opinion.

199.    Hall's August 29, 2013, grievance was denied by Defendant Hiedi Abbott on

44

September 5, 2013, and then again by Defendant Cindy Hiner on September 23, 2013. Hall appealed. The appeal was denied by Defendant Cathy Redfern then again by Defendant Jane LaMoure.

200. On August 30, 2013, Hall filed another grievance complaining of deliberate indifference and callous disregard for a serious medical condition, a failure of prison medical personnel to get a complete understanding of Hall's injury, and the failure of medical personnel to carryout the treatment plain prescribed by the orthopedic specialist MSP obtained for his care. Hall requested a complete investigation and that action be taken to insure that he receive qualified and adequate treatment commensurate to prudent medical standards. Defendant Hiedi Abbott denied the grievance on September 18, 2013. The grievance was later incorporated into another but similar grievance filed on September 24, 2013 (Gr. No. 4775).

201. On September 5, 2013, Hall was taken to Pintler Surgical Specialists where he was seen by orthopedic specialist Dr. Pine for a follow-up appointment.

202. The September 5, 2013, follow-up appointment with Dr. Pine was scheduled by MSP two weeks past the time that Dr. Pine had originally prescribed in his treatment plan date July 15, 2013.

203. During Hall's September 5, 2013, appointment with Dr. Pine, Hall described in detail the increased complications he was suffering, decreased range of

motion, his inability to move his arm on his own without having to use his left arm to support his right, and MSP's absolute refusal to provide him with any assistance with physical therapy. Hall further explained how MSP only scheduled one PT session before requiring he perform PT on his own in his cell, how he was unable to move his arm to repeat any of the motions that the therapist performed on him, and how Defendant Dr. Kohut changed the range of motion PT program performed by the physical therapist to isolated pressure exercises using the wrist.

204.   Hall went into detail describing the sharp spikes in pain, additional internal bleeding, swelling, and how whenever he attempted the pressure exercises shown to him by Defendant Dr. Kohut he experienced sensations that felt like a belt was being tightened around the bone in his right arm just below his shoulder. Hall also explained that his pain became so severe, even during the slightest of movement, that he eventually stopped movement altogether and cradled his arm.

205.   When Hall asked Dr. Pine if the treatment he received by the prison was the treatment he intended, Dr. Pine stated that because Hall is a ward of the state he has no control over the level of care that he receives – that the prison controls everything. He then stated that over-all it sounded like Hall had received a limited amount of therapy and that he will be recommending a

more aggressive PT plan.

206. Hall asked Dr. Pine what he meant by a more aggressive PT plan and expressed concern about the vague descriptions in his orders to the prison. Hall explained to Dr. Pine that he needs to be more descriptive in describing his assessments, diagnoses, and the treatment plan or the prison will use the opportunity to provide the least amount of care possible. Dr. Pine stated that he only makes the recommendation and that it is up to the prison to decide the level of treatment that will be provided. Hall stressed he does not want to suffer any physical loss or become disabled if it can be helped.

207. Hall then explained his concerns about the decision not to perform surgery after it was opined that without it he will suffer loss of range in motion and normal use of his shoulder. Dr. Pine responded by stating that he did not want to put in a bunch of metal and screws only to have to remove them later. He explained that there is a risk that if he resets the fracture and pulled the ball out of the bone and into its proper position, because the ball is smashed into the humeral head, blood flow to the impacted area may be lost and that should that happen it would require additional surgery in about two years. Dr. Pine stated that at Hall's age he (Hall) does not need the use of his shoulder as much as in his youth and that the restriction he will have without surgery wont impact his life like it would if he were younger. Dr.

Pine stated to Hall that it is for this reason he has elected for the more conservative treatment option of physical therapy and asked Hall to give it time to work. Dr. Pine stated if that does not work, he will look at other treatment options.

208. Dr. Pine concluded his consultation with Hall by stating that he is recommending more physical therapy and will see him again in 4 to 6 weeks. Hall again asked Dr. Pine if he will please be more descriptive with the prison.

209. On September 9, 2013, after re-attempting to perform PT on his own in his cell, as ordered by the prison medical staff, Hall submitted a medical kite complaining of severe pain and that the medication he is taking (Tramadol) is not working. Hall also complained that he believed he injured himself during range of motion exercises. He explained that he is experiencing a new stabbing pain that flares up with every movement. He explained, "It's a needle like pain that shoots into my bone. Constant pain is burning and stinging sensation that fluctuates from moderate to severe." Hall further complained that he is hesitant to exercise as it results in severe bouts of pain.

210. The evaluating nurse receiving Hall's September 9, 2013, medical kite recommended he be seen by a Physician Assistant. Hall, while suffering severe pain, was not seen until 14 days later on September 23, 2013, at

which time no action was taken.

211.  On September 13, 2013, Hall submitted an informal grievance complaining that the pain medication he is taking (Tramadol twice daily, once at 4:00 pm and then again 8:00 pm) is completely ineffective, and that his complaints are being ignored and he is being made to suffer severe pain.  He requested adequate medical care and adjustments to his medication to a level that was effective.  Defendant Hiedi Abbott waited five days before denying the grievance on September 18, 2013.  Hall did not receive notice of the denial until another five days had passed.  The informal was later incorporated into grievance number 4775.

212.  On September 14, 2013, Hall submitted yet another medical request complaining of severe pain.  He was seen the next day by a Registered Nurse, who referred him to the provider.  No other action was taken.

213.  On September 15, 2013, Hall submitted yet another medical request to the prison Infirmary complaining of severe pain.  He explained his condition as "a great deal of pain in my right shoulder and arm that shoots to my finders.  The pain is a sharp piercing and ache at the top of my shoulder and a strong ache in my arm that extends halfway between my right shoulder and elbow."  Hall further explained, "I feel a lot of pressure like a belt is tightened around my arm.  I also feel periodic stabbing sensations on the side and back of my

shoulder." To help with pain Hall began heating a wet towel wrapped in a plastic bag in a microwave during his one hour per day dayroom period. Hall's request was written with his left hand due to severe pain in his right arm.

214.   On September 16, 2013, Hall submitted another informal grievance complaining that he was being denied medical treatment, and for cruel and unusual punishment. Hall complained that the prison failed to provide the treatment prescribed by the orthopedic specialist MSP obtained to treat his shoulder injury, and that Defendant Dr. Kohut changed the therapy recommended by the orthopedic specialist to one that he (Dr. Kohut) was shown by his therapist when he broke his shoulder years earlier. Defendant Hiedi Abbott waited 22 days before responding, only to report that she refused to process the grievance by deeming it non-emergent. Hall waited another 9 days before notice of the denial was delivered and served to him. The grievance was also written by Hall using his left land – because the pain he was suffering was so severe that he was unable to write with his right hand.

215.   On September 13, 2013, Hall's prescription for Tramadol abruptly ended. Until this date he had been administered Tramadol for the treatment of pain for 67 continuous days.

216.   Hall affirmatively states that the use of Tramadol for the treatment of pain
       associated with his broken humeral head was mostly ineffective.

217.   Over the course of the 67 days during which Hall was prescribed Tramadol
       for the treatment of pain, which he continuously complained as being mostly
       ineffective, MSP medical staff, namely Defendant Dr. Kohut, refused to
       address the issue.  Consequently, Hall affirmatively states he suffered so
       greatly that he began to believe he was better off dead and at times suffered
       from suicidal ideations.  Hall further affirmatively states, had it not been for
       his strong bond with his mother he would have committed suicide.  Hall also
       affirmatively states that due to his suffering and the lack of treatment for
       pain, he did periodically conduct experiments in how to commit suicide.

218.   On September 14, 2013, Hall sent a medical kite requesting supplemental
       medication to help alleviate pain in his shoulder.  In the kite, Hall states he is
       suffering from a strong bout of nausea, diarrhea, and severe depression.  He
       noted that the abrupt discontinuation of the medication Tramadol only
       affirmed its ineffectiveness in treating his pain.  He also stated that he
       continued to suffer moderate to severe pain while his complaints were going
       unanswered.  Incidentally, his kite was answered like the rest and the only
       action taken was to recommend him to a provider.

219.   On September 15, 2013, Hall again submits a medical kite complaining of

pain. On this occasion, the pain was so severe that he was unable to use his right hand to write. He used his left instead.

220. In Hall's September 15, 2013, medical kite he complained, "I'm experiencing a great deal of pain in my right shoulder and arm that shoots to my fingers. The pain is a sharp piercing and ache at the top of my shoulder and a strong ache in my arm that extends half way between my right shoulder and elbow. I feel a lot of pressure like a belt is tightened around my arm. I also feel periodic stabbing sensations on the side and back of my shoulder. I have been keeping my arm immobilized to prevent flare-ups and using a home made heating pad during my dayroom to settle pain."

221. To help alleviate pain, which was intolerable and caused Hall to cry, curse, and question God, he got a towel wet with water and heated it to steaming temperatures in a microwave that was available to inmates on the housing block during their one-hour dayroom period. Hall placed the heated towel in a plastic bag then wrapped a dry towel around the bag so he could apply it to his shoulder.

222. Towels are not to be kept in the cells by inmates in LHU-2. Inmates are issued a towel at the start of their one-hour dayroom period, to be used for showering only. Afterwards, the towel is to be returned to unit staff. Passing any items between inmates in LHU-2 was also against unit policy,

but sympathetic unit staff over-looked the policy to allow Hall to pass a wet

towel to other inmates during their dayroom to have it heated in the

microwave.

223.    As previously stated, on September 13, 2013, Hall was abruptly taken off the

medication Tramadol after taking the drug twice daily for 67 continuous

days (see ¶215 above).  Hall began to suffer from withdraws as early as

September 14, 2013 (see ¶218 above).  By September 17, 2013, Hall was

suffering from severe withdraws with symptoms that included strong bouts

of anxiety, mood swings from severe depression with suicidal thoughts to

sudden extreme happiness.  He also began suffering from delusions about

going home soon to thoughts that he was dieing and would never see his

loved ones again.  Physically Hall was suffering from strong nausea,

diarrhea, hot and cold spells, and restlessness to bouts of extreme fatigue,

sensations of electrical shocks throughout his nervous system that caused

violent jerking in his body, fitful sleep, and insomnia.

224.    On September 18, 2013, Hall sent another medical kite complaining, "I am

suffering severe pain in my right shoulder.  I know I was told if I complain

or start grievances I would be slow played and made to suffer.  I don't mean

to complain.  I didn't hurt anyone to get here.  I am a non-violent

commercial property offender.  I'm not trying to justify myself.  I'm just

begging that you please give me mercy and not use my serious life changing

injury to extract retribution, further punish me, or torture me." Hall went on

to further state, "I've complained a lot and I'm sorry but my suffering is

really bad. Even a heating pad will help. But counsel with no action is not

helping to reduce my pain. Please help me. PLEASE! I don't want to use

drugs. A heating pad seems to work. I've been using a homemade one

during my dayroom." Defendant Registered Nurse Dan Curran answered

the kite, which offered no help what so ever. Again, no action was taken.

225.    On the morning of September 19, 2013, Hall again submitted a medical kite

complaining of severe pain. Shortly thereafter, he was taken to MSP's

Transportation Department to be transported to Missoula, Montana, where

he was to be seen by a specialist for a second opinion.

226.    As Hall was being escorted to the Transportation Department, he saw

Defendant Dr. Kohut entering the prison through the main entrance port.

Hall called out for Dr. Kohut, to ask why he was not answering medical staff

referrals related to his (Hall) pain. When Hall called out to Defendant Dr.

Kohut, he turned and looked at him. He then completely ignored Hall as he

walked on.

227.    Once at the Transportation Department's office Hall was taken to Northern

Rockies Orthopedics in Missoula, Montana, to be seen for a second opinion

to that of Dr. Pine's.

228.   Once at Northern Rockies Orthopedics Hall was met by Dr. Stephen Powell, who stated that he was to evaluate Hall's injury for the purpose of providing a second opinion.  He then asked the Transportation Department officers for any medical files that the prison had sent.  The officers provided Dr. Powell with a copy of the initial X-Ray report, written by Dr. Jason White of DLCMC dated July 8, 2013, and the two reports written by Dr. Pine dated July 9 and July 15, 2013, but nothing more.

229.   After reading the reports, Dr. Powell asked the officers if the prison had sent any image discs containing the initial X-Rays and CT scan.  The officers stated they were only provided with the three written reports that they handed over.

230.   Dr. Powell then addressed Hall and asked how he was doing.  Hall complained that he is suffering from severe pain and that he believes the prison is not providing the proper care.

231.   Dr. Powell commented that there is no doubt that Hall is in pain.  He then apologized and stated that he can only conduct the evaluation and nothing more.  Dr. Powell then asked Hall to explain how he suffered his injury.

232.   After Hall explained how he was injured, Dr. Powell had the officers remove his hands from the restraints that were applied to his body.  At that time,

Hall's hands were handcuffed to a belly chain that was locked around his waist.

233.  After the restraints were removed, Dr. Powell then took Hall's right arm and began to gently moved it around until Hall began to complain of extreme pain.

234.  After moving Hall's arm and pressing on his shoulder, Dr. Powell asked him to move his arm on his own.  When Hall demonstrated only slight movements, to the point where he began to experience strong sharp, piercing pain in his shoulder, Dr. Powell had him stop.

235.  Next, Dr. Powell asked Hall what kind of treatment he was receiving at the prison.  Hall explained that Dr. Pine initially recommended surgery but then elected to a more conservative course of treatment consisting of only physical therapy, after he opined that surgery at that time might do more harm than good.  Hall explained that after Dr. Pine's review of the CT scan he recommended that he (Hall) remain in the immobilizer for two weeks, and then to begin a course of physical therapy with gentle range of motion exercises for three weeks before being returned for a follow-up evaluation.

236.  Hall then complained that he only attended one PT session with MPT E. Shane Spears of Premier Physical Therapy in Deer Lodge, Montana, at which time no education or instruction was provided, before being told by

the prison medical doctor to perform the PT on his own in his cell. Hall also explained that when he complained to prison medical staff that he was unable to repeat the exercises performed on him by the physical therapist without assistance, Dr. Kohut changed the regimen from gentle range of motion PT ordered by Dr. Pine and performed by MPT E. Shane Spears to isolated wrist exercises that were shown to him (Dr. Kohut) by his physical therapist when he broke his shoulder years before. Hall further explained that he believed he injured himself while attempting to perform the exercises shown to him by Dr. Kohut.

237. After hearing Hall's descriptions, Dr. Powell commented that it was probably too soon for him to be performing the kind of physical exercises shown to him by Dr. Kohut. Dr. Powell then asked the officers accompanying Hall if it was OK that he takes X-Rays of Hall's shoulder at that time.

238. After the officers approved the X-Rays, Hall was taken to the facility X-Ray room. Three X-Rays were taken of the front view of his shoulder. Hall was then taken back to the exam room were he was later met by Dr. Powell.

239. After Dr. Powell returned and the nurse loaded the X-Rays on a computer monitor in the exam room, Dr. Powell spent approximately 10 seconds examining a single X-Ray before commenting that the fracture is healing.

He then opined that Hall may be able to regain about 90% to 95% mobility with proper physical therapy, but that recovery could take up to a year. He also opined that he could not rule out eventual surgery without a more thorough examination using a CT scan. He then dismissed Hall who was transported back to MSP.

240.   After Hall's return to MSP, a nurse served him with responses to his medical kites of September 18 and September 19, 2013 (noted in ¶224 and ¶225 above), both of which disposed only that Hall is scheduled with a doctor to discuss the issue.

241.   Later in the day of September 19, 2013, after receiving more of the same response to his medical kites regarding severe pain, Hall wrote an Offender/Staff Request ("OSR") to Defendant Leroy Kirkegard ("Kirkegard") stating, "I'm writing to beg for mercy. I'm in severe pain due to a serious life changing injury that is leaving me permanently disabled. The Infirmary seems to be refusing me treatment. I've sent kite after kite and grievance after grievance to no avail. I've been using a home made heating pad that I heat in the microwave during my dayroom and that reduces my pain to tollerable [sic] levels. The pain becomes so severe that I get suicidal thoughts. I've reported this to the Infirmary but I'm only seen by nurses who can't do anything. I'm not asking for drugs, I hate them. I'm

only asking for a heating pad as the one I made, which I can only heat once

per day, works better to dull my pain. PLEASE HELP ME!" Incidentally,

Kirkegard did not answer the OSR. He instead forwarded it to Defendant

Associate Warden Myron Beeson ("Beeson").

242.    Defendant Beeson responded to Hall's OSR to Kirkegard on September 25,

2013, on a separate OSR that Hall sent to Kirkegard on September 24, 2013.

The response is noted in ¶267 below.

243.    Also on September 19, 2013, Hall submitted a grievance complaining about

severe pain. In it, Hall stated that unit staff had called the Infirmary once at

11:00 am and again at 2:00 am related to his pain but that no Infirmary staff

responded. Defendant Hiedi Abbott refused to process the grievance and

waited 19 days until October 8, 2013, before responding. The grievance was

not returned to Hall until October 17, 2013, a total of 28 days after Hall sent

his complaint.

244.    On September 20, 2013, Hall submitted another grievance complaining of

severe pain and suicidal thoughts. This too was not processed by Defendant

Hiedi Abbott, for reason that she deemed the issue non-emergent. As with

Hall's September 19, 2013, grievance noted in ¶243 above, Abbott did not

respond to the grievance until October 8, 2013, 18 days after it was

submitted; and didn't receive notice of Abbott's refusal to process the

grievance until October 17, 2013, 27 days after it was submitted.

245.   Also on September 20, 2013, Hall submitted yet another grievance. This time he complained about Defendant Dr. Kohut's conduct and requested he be removed from his (Hall) treatment plan. Defendant Hiedi Abbott responded the same as she did as noted in ¶243 and ¶244 above.

246.   On September 21, 2013, Hall reported to Defendant P.A. Fisk that he was taken off Tramadol and wanted to discontinue treatment of nausea associated with the drug. He further reported that the nausea he was suffering (after the discontinuation of Tramadol) is associated with severe pain and that the medication has had no effect. P.A. Fisk asked Hall to sign a refusal of treatment for the medication used to treat his nausea, which he did. She then instructed Hall to re-kite the Infirmary should he wish to continue using the medication.

247.   On September 23, 2013, Hall was met by Defendant Dr. Kohut related to a medical kite he (Hall) sent to the Infirmary, requesting he be scheduled for a Hepatitis C ("Hep C") liver function test. Hall could see that Dr. Kohut also had in his hand a medical kite from September 9, 2013 (noted in ¶209 above) in which he complained of pain and the possibility that he suffered additional injury to his shoulder while performing PT on himself, as ordered.

248.   During Hall's September 23, 2013, meeting with Defendant Dr. Kohut he

complained of severe pain in his shoulder. Defendant Dr. Kohut ignored
Hall's comments by instead stating to Hall that he was being seen related to
his request for Hep-C testing. Defendant Dr. Kohut then stated to Hall that
he will not be ordering any Hep-C testing for reason that he only conducts
tests on inmates who are sexually active and/or using drugs. When Hall
explained he was asking for liver function tests and that he already has Hep-
C, Defendant Dr. Kohut looked in Hall's file and commented that he was
last tested in May of 2013. Hall then stated that the Hep-C issue was the
least of his concerns and wanted to instead discuss the issue related to his
pain. Hall then began to explain that on the pain scale of 1 to 10, he is
suffering a constant and persistent level of five. He described the pain as a
strong charley horse in his right shoulder and a sharp cutting pain between
the top of his right bicep and deltoid. He further explained a third point of
pain in his back under the bottom part of his right shoulder blade (scapula),
which described as feeling like a red hot rod iron that is stabbing into him.
He explained that he is using a homemade heating pad to help reduce pain to
tolerable levels.

249.   Defendant Dr. Kohut did not immediately address Hall's issue of pain. He
instead asked Hall if he had been to physical therapy. When Hall explained
that he had only attended one session before he (Dr. Kohut) ordered that he

61

(Hall) perform PT on his own in his cell, Dr. Kohut denied ever ordering such a thing.

250.    Hall then refocused the discussion back to the issue of pain and told Defendant Dr. Kohut that he is serious and not trying to get on drugs…Hall explained he is seeking effective pain management treatment and will accept any alternative methods.  He went on to explain that the Tramadol did not work for him and that the withdraws he suffered, after he was abruptly taken off the drug without any step-down or tapering, was in some ways worse than the pain and that that is one of the reasons why he opts for alternative treatments before medications.  Hall stated to Defendant Dr. Kohut that he has a high tolerance for pain and believes he is able to cope with higher pain levels than most people.  Hall again explained his use of a homemade heating pad to reduce pain to tolerable levels and how he would prefer that option rather than narcotic pain medications.

251.    Defendant Dr. Kohut again went off topic by instead focusing that Hall explain in more detail how he is able to make a heating pad.  After Hall explained that he takes a wet towel, places it in a plastic bag, heats it in a microwave, wraps a dry towel around the heated plastic bag then applies it to the areas of pain, he (Dr. Kohut) turned to Correctional Officer Meeks, who was one of the escorting officers standing in the exam room, and asked

if he was getting this.  Hall, having the impression that Defendant Dr. Kohut was trying to implicate a disciplinary action again him, stated that staff are aware of the homemade heating pad and have given him permission.  Correctional Officer Meeks confirmed that Hall's statement was true.

252.   Hall again asked Defendant Dr. Kohut if he was going to help him with pain management.  Defendant Dr. Kohut stated to Hall that he was not going to help and went further to state that he does not treat inmates for pain.

253.   When Hall stated that during flare-ups, when his pain becomes intolerable he begins to have suicidal thoughts, Defendant Dr. Kohut stated that that sounds like a personal problem that he (Hall) needs to bring up with mental health.

254.   Defendant Dr. Kohut then asked Hall when does his (Hall's) pain flair up, Hall replied by explaining it is unpredictable.  Defendant Dr. Kohut commented by stating it is not unpredictable, something is causing the pain.

255.   Hall again explained that even the slightest amount of movement causes pain, especially between his right bicep and deltoid and in his back under the bottom part of his right shoulder blade; and that his shoulder constantly and persistently feels like a strong charley horse.  Hall further explained that he suffers flare-ups between his right bicep and deltoid when ever he performs the isolated pressure exercises that he (Dr. Kohut) showed him (Hall) using

his wrist; inside and throughout his shoulder, arm, and back under the bottom part of his right shoulder blade when ever he moves his arm more than 40% in any direction; and in his back under the bottom of his shoulder blade when ever he lays on his back. Hall also explained that he suffers flare-ups in his sleep that wake him up from the pain, but that he does not know what he does to cause the flare-ups.

256. After hearing Hall's description Defendant Dr. Kohut responded by commenting that maybe he (Hall) should not be doing what causes him pain.

257. Hall responded by asking Defendant Dr. Kohut if he was going to help him. Dr. Kohut replied by telling Hall that he was not going to offer any help with his pain.

258. Hall responded by asking Defendant Dr. Kohut if he will at least allow for an electric heating pad and explained that it helps reduce the pain. Defendant Dr. Kohut replied by telling Hall no and stated that the prison Infirmary does not issue heating pads because inmates use them to make pruno (a homemade wine). Hall then asked about any topical creams or patches. Defendant Dr. Kohut stated that he (Hall) can check the canteen and purchase them from there.

259. Hall then became agitated and asked Defendant Dr. Kohut why he was denying him treatment and making him suffer. Defendant Dr. Kohut

responded by telling Hall no and further stated that if he (Hall) continues like this he can go back to his cell.

260.   At that time, Hall became visibly upset and turned to Correctional Officer Meeks, asking if he would be a witness to Defendant Dr. Kohut's attitude and demeanor.  Dr. Kohut then immediately spoke up and ordered Correctional Officer Meeks to remove Hall from the exam room.  Hall, at that time, got up and left.

261.   As Hall was being escorted past Unit Case Manager Vera Hoscheid's office, he stopped and explained the situation related to Defendant Dr. Kohut's refusal to offer treatment for his pain and his demeanor.

262.   Vera Hoscheid, after hearing Hall's complaint, asked if he (Hall) had contacted the Warden.  When Hall explained that he did write Kirkegard and submitted numerous grievances, she said to Hall that she would contact Linda Moodry and the Warden about the situation.  Hall was then returned to his cell.

263.   After being returned to his cell, Hall immediately initiated a grievance about his encounter with Defendant Dr. Kohut (informal grievance of September 23, 2013).  Defendant Hiedi Abbott refused to process the grievance the same as she did on all previously noted occasions.

264.   On September 24, 2013, Hall incorporated his first level (informal)

grievances, which Defendant Hiedi Abbott refused to process, into a single grievance. (The informal grievances are referenced at ¶¶200, 211, 214 and 245 above). A Registered Nurse from the prison Infirmary, the signature of whom Hall cannot identify, replied with information Hall disputes as true, particularly that Hall refused treatment. (This person is identified as Nurse Jane Doe in the caption.)

265. Hall appealed the grievance response of Nurse Jane Doe on October 10, 2013. The appeal was denied by Defendant Cathy Redfern on October 23, 2013. It was again denied by Defendant Jane LaMoure on November 18, 2013.

266. Hall affirmatively disputes that he ever refused treatment for his shoulder. The only treatment Hall refused was the optional treatment medication for nausea. The medication was ordered to be taken as needed and when Hall requested removal from the medication, he felt it was no longer needed.

267. On September 24, 2013, Hall submitted a medical kite complaining about Defendant Dr. Kohut's hostility towards him, and the failure of medical staff to respond to his need for care. A nurse replied by merely referring Hall to the provider.

268. Also on September 24, 2013, Hall again sent an OSR to Defendant Kirkegard. (The first OSR to Kirkegard is noted in ¶241 above.) In this

OSR, Hall complained that he is suppose to be undergoing physical therapy but that the Infirmary is denying him the treatment and requiring he perform physical therapy on his own. Hall also complained of Defendant Dr. Kohut's hostility toward him and requested Defendant Kirkegard to help. The OSR, as with the first referred to in ¶241 above, was forwarded to Defendant Beeson for an answer. Beeson responded by writing, "Will forward to the medical staff so they are aware and they can let me know their side of the issues." The response was dated September 25, 2013, with copies sent to Defendants Cathy Redfern and Cindy Hiner. Incidentally, Defendant Beeson never followed-up on the issue as he indicated he would.

269. On September 27, 2013, Hall submitted a medical kite complaining of severe pain. A nurse answered by merely stating that Hall had been "PUT INTO See Provider please be patient." [sic]

270. On September 28, 2013, Hall submitted a medical kite requesting to see orthopedic specialist Dr. Pine. Hall commented that he believed his humeral head had fused to his shoulder socket.

271. A nurse responded to Hall's September 28, 2013, medical kite by stating that the "process has been started."

272. On September 30, 2013, Hall submitted a second medical kite requesting to see orthopedic specialist Dr. Pine. In response, Hall was seen by an

unknown nurse who conducted an evaluation.

273.    During the evaluation, the nurse asked Hall to provide the history of his

injury and treatment.  Hall explained the history and added that he has been

unable to adequately perform range of motion exercises on his own as

shown to him by the physical therapist.  Hall further explained that after

seeing Dr. Powell for a second opinion, who opined that it is probably too

soon for him (Hall) to be performing the kind of exercises Dr. Kohut

ordered, Hall stopped performing the isolated pressure exercises.  Hall went

further to explain that he is unable to lift his arm on its own more than 40%

in any direction before he must use his left hand for support, and that any

range past 40%, in the forward position, causes his entire shoulder region to

move unnaturally.  Hall explained that he is restricted to a range of motion

of about 30% outward from his side before his entire shoulder begins to

move unnaturally and that that region, outward to the side of his body,

causes severe pain past 40% in the upward motion.  Hall expressed concern

that his shoulder had become frozen.  The nurse referred Hall to the

provider.

274.    On September 30, 2013, Hall initiated a grievance against Defendant

Dr. Kohut for staff misconduct after inmate Billy (William) Wild informed

him (Hall) that he heard Dr. Kohut discussing his (Hall's) medical

information with a correctional officer (non-medical staff). Hall's grievance alleged deliberate and malicious violation of medical privacy, and dissemination of false statements designed to smirch Hall's person. The grievance was denied by Defendant Hiedi Abbott on October 15, 2013. Hall advanced the grievance to the formal level on October 21, 2013. It was denied by Defendant Cindy Hiner on November 4, 2013. Hall then appealed. The appeal was denied by Defendant Cathy Redfern on November 18, 2013, and again by Defendant Mike Batista on January 10, 2014.

275. On September 30, 2013, Defendant Peterson filed a Refusal of Treatment claiming Hall refused an appointment with the provider. In her comments, she listed that Hall had been informed of the risk and possible consequences for refusing treatment to be "(a) continued or worsening symptoms; (b) permanent injury or damage."

276. Refusals for medical treatment must be signed and witnessed by the inmate. If an inmate refuses to sign, it must be signed by the medical staff and a witnessing correctional officer as to the inmate's refusal to sign.

277. Hall affirmatively states he never refused treatment as Defendant Peterson alleged, and that his signature or that of any witness as to his refusal to sign exists. Hall further alleges the refusal is false.

278.   On October 2, 2013, Hall submitted a grievance against Defendant Dr.

Kohut alleging falsification of his (Hall's) medical records, for filing a false

report that he (Hall) refused treatment.  Hall's grievance further alleged that

Defendant Dr. Kohut's hostility towards him (Hall) is retaliation and that Dr.

Kohut has placed him (Hall) in fear for his safety.

279.   On October 15, 2013, Defendant Hiedi Abbott denied the grievance by

stating it was nursing staff who generated the form and not Dr. Kohut.

Abbott's response did not address the claim of retaliation or Hall's fear for

his safety.

280.   On October 3, 2013, Hall sent an OSR to Unit Case Manager Vera Hoscheid

requesting to meet with her A.S.A.P. related to his (Hall's) medical

condition and the increased hostility of Defendant Dr. Kohut towards him

(Hall).  Hall reported that he believed the situation had reached a critical

level and that he feared for his safety.  Ms. Hoscheid responded by writing

back, "I am sorry to hear you are having problems.  There is a grievance

process and you should utilize it if you deem it necessary.  Unfortunately, I

cannot force medical personnel to provide you with your requests."

281.   On October 7, 2013, Correctional Officer ("C.O.") Melvin and C.O. Elmos

of LHU-2 escorted Hall to the LHU-2 pilot medical exam room, to be seen

by Defendant Dr. Kohut.  As Hall was being escorted, he informed both

70

officers about issues he has with Dr. Kohut, numerous pending grievances against him, and his hostile demeanor.  Hall then requested both officers accompany him into the exam room as witnesses.

282.   Once at the LHU-2 pilot medical exam room, C.O. Elmos accompanied Hall into the room while C.O. Melvin remained outside but at the door.

283.   After Hall's vitals were taken by an unidentified nurse, Defendant Dr. Kohut entered the exam room and asked Hall what he can do for him.  Hall stated he has amply documented his needs in numerous kites and that various nurses have completed exam worksheets documenting his issues.  Defendant Dr. Kohut responded by stating, "Tell me what you're here for."  Hall replied by stating he is there to be seen about his shoulder.  Defendant Dr. Kohut responded by stating, "OK, What about your shoulder."

284.   Hall affirmatively states that at that time he began to feel intimidated by Defendant Dr. Kohut's tone of voice and demeanor.  Hall responded to Dr. Kohut's demand by explaining that he is there to request to be seen by his treating specialist, Dr. Pine, as was ordered in his (Dr. Pine's) previous treatment plan.  Defendant Dr. Kohut responded by telling Hall that he will be the one to determine when he (Hall) will be seen and by whom.  He (Dr. Kohut) again stated, "Tell me why you're here."

285.   Hall replied by explaining that he is suffering from constant and persistent

pain that makes him feel suicidal during flare-ups.  Hall gave the same description as described in ¶255 above.  When Hall finished his description of the pain he is suffering, Defendant Dr. Kohut responded by stating, "Is that all."

286.   Hall replied by stating that he also believes his shoulder has become frozen in the socket and offered the same description as noted in ¶273 above, adding only that he believes he has lost more range in motion.  Defendant Dr. Kohut then instructed C.O. Elmos to free Hall's right arm for the restraints.  Hall was belly-chained around his waist and his hands cuffed to the chain with each hand to at their respective side.  His legs were also bound at the ankles using soft straps.

287.   After C.O. Elmos removed Hall's right hand from the restraints, Defendant Dr. Kohut told him to stay close in case Hall assaults him.

288.   C.O. Elmos responded to Defendant Dr. Kohut's comment by telling him that Hall is not violent and is one of the most trusted inmates in the unit.  Defendant Dr. Kohut replied by stating to C.O. Elmos that he will want to stay close for this.

289.   Defendant Dr. Kohut then instructed Hall to demonstrate his problem by performing range of motion movements.  When Hall raised his arm in the forward motion about 30% and commented that that is the position where

problems began, Dr. Kohut took hold of his (Hall's) arm and began moving

it further.  At that instant Hall's shoulder popped at the point of the

Acromioclavicular joint and Hall yelped in pain.  Hall told Defendant Dr.

Kohut to let go and that he (Dr. Kohut) was hurting him (Hall).

290.   Defendant Dr. Kohut responded by telling Hall to relax and stated, "I need to

do this.  Don't tense up or resist."  Dr. Kohut then began moving Hall's arm

aggressively from side to side.  Hall again repeated himself for Dr. Kohut to

stop and let him go, and told him that he (Dr. Kohut) was hurting him (Hall).

291.   At that time, C.O. Elmos stated that he thinks that he (Defendant Dr.

Kohut) should let go of Hall.  C.O. Melvin, at that time, also stepped into the

exam room.

292.   Defendant Dr. Kohut responded by releasing Hall's arm and commenting

that he has seen enough.  Dr. Kohut then began looking in Hall's medical

file before commenting, "I see I'm giving you an analgesic balm."  He then

asked Hall what else he is taking.

293.   Hall replied by stating that he thinks he (Dr. Kohut) hurt him, because his

shoulder is beginning to flare-up in pain.  Hall then explained that he (Dr.

Kohut) will not treat him (Hall) for pain; and how he (Hall) has had to resort

to a homemade heating pad and Ibuprofen for the treatment of pain.  Dr.

Kohut then stated to Hall that he (Dr. Kohut) will be prescribing him (Hall)

once-a-day medication to help with pain.

294.   Defendant Dr. Kohut then stated to Hall that he (Dr. Kohut) is going to

demonstrate what MPT E. Shane Spears (the physical therapist obtained by

MSP to administer PT) instructed him (Hall) to do.  At that time, Hall

interrupted and stated that Mr. Spears did not give him (Hall) any

instructions or offer any explanation into the course of therapy -- other than

to direct him (Hall) to repeat the motions he performed on him during the

one PT session, should he (Hall) not be returned to his office for additional

PT treatment.  Hall further explained that Mr. Spears stated that he (Hall)

was only scheduled for the one session.

295.   After hearing Hall's comments, Defendant Dr. Kohut stated that he (Dr.

Kohut) wants him (Hall) to do what was shown to him (Dr. Kohut) by his

physical therapist when he broke his shoulder.  Dr. Kohut further

commented that he (Hall) should be able to perform the exercises on his own

without any assistance by medical staff.  He (Dr. Kohut) then began to

demonstrate by pressing his wrist against the edge of a table in the forward,

side, and backward motions.

296.   After Defendant Dr. Kohut performed the demonstration of what he wanted

Hall to perform, Hall expressed concern by explaining that the exercises

demonstrated are not the exercises ordered by Orthopedic Specialist Dr. Pine

or performed on him by Physical Therapist E. Shane Spears.  Hall further
explained that when he saw Dr. Powell for a second opinion to that of Dr.
Pine's, Dr. Powell opined that it was probably too soon for that kind of
exercising given the nature of his (Hall's) injury.

297.   Defendant Dr. Kohut responded by telling Hall that the exercises he
demonstrated are those shown to him by his therapist.  Hall replied by
stating that maybe his injury is not like the one he (Dr. Kohut) suffered and
that two orthopedic specialists ordered gentle range of motion physical
therapy and not self administered isolated pressure exercises using the wrist,
like what Dr. Kohut demonstrated.  Hall then suggested to Defendant Dr.
Kohut that perhaps that is why he is suffering so much and why his shoulder
is freezing up.

298.   Defendant Dr. Kohut stated to Hall that the reason why his shoulder is
freezing up is because he (Hall) is not performing range of motion exercises
as instructed.  Hall replied by asserting that he attempted to show him (Dr.
Kohut) what he (Hall) has been doing before he (Dr. Kohut) grabbed his arm
and started hurting him.

299.   Defendant Dr. Kohut told Hall that from what he witnessed; Hall was doing
the range of motion exercises wrong.  He then demonstrated what Hall
should have been doing by keeping his elbow down to his side, bending his

arm at the elbow in the upward position until his hand was upright near the top of his shoulder, then thrusting his hand upward in a press position. Hall responded by stating that what he (Dr. Kohut) demonstrated is not what MPT Mr. Spears performed on him. Hall further asserted that it is literally impossible for him to perform the kind of motion Dr. Kohut just demonstrated.

300. Hall then stated to Defendant Dr. Kohut that he believes he (Dr. Kohut) is intentionally denying him (Hall) physical therapy as ordered by two specialists, obtained by MSP for his (Hall's) care, and providing bad instructions for him (Hall) to perform on his own without any professional guidance. Hall also asserted that he believes Dr. Kohut is providing bad instructions and denying him (Hall) physical therapy in an effort to cause him (Hall) harm, and that that is why he (Hall) is grieving him (Dr. Kohut).

301. Upon hearing Hall's concerns, Defendant Dr. Kohut instantly became angry with him and ordered C.O. Elmos and C.O. Melvin to return Hall to his cell.

302. As Hall was being escorted back to his cell, he commented to both C.O. Elmos and C.O. Melvin that he believed Dr. Kohut assaulted him when he (Dr. Kohut) grabbed his (Hall's) arm unexpectedly.

303. In reference to Hall's comment in ¶302 above, C.O. Elmos stated to Hall that that is what it appeared to him.

304.   Hall then complained that his pain level is very strong and growing stronger and asked permission to heat his homemade hearting pad before locking down.

305.   In reference to Hall's comment in ¶ 304 above, C.O. Elmos commented that he did not see any problem with that as long as no-one was out in the dayroom.

306.   Within an hour after seeing Defendant Dr. Kohut (October 7, 2013), Hall submitted a medical kit complaining of pain.  Hall also described two new points of pain in his right arm.  He described the first as feeling as if a blunt object was being pressed against the top of his shoulder blade (scapula) nearest his neck, with strong force.  He described the second pain as being located in his right clavical (the acromion and Acromioclavicular joint).

307.   Also on October 7, 2013, after submitting the medical kite noted in ¶306 above, Hall initiated a grievance related to Defendant Dr. Kohut's grabbing his (Hall's) arm without warning and causing him (Hall) pain and injury. On October 15, 2013, Defendant Hiedi Abbott refused to process the grievance because Hall failed to include the action he was requesting.

308.   In addition to the grievance noted in ¶307 above, Hall also initiated an emergency grievance against Defendant Dr. Kohut.  In that grievance Hall alleged assault and mistreatment of prisoner.  On October 16, 2013,

Grievance Coordinator ("G.C.") Kristy Cobban responded to the grievance by explaining that MSP Medical staff deemed the issue non-emergent. She then instructed Hall to complete an informal grievance.

309.   On November 12, 2013, Hall advanced both grievances noted in ¶¶307 and 308 above to the formal level. Defendant Cindy Hiner, supposedly acting on behalf of Defendant Kathy Redfern, denied the grievance by stating, "A physical exam is necessary by the phycian [sic] for complete assessment and evaluation of your issue and development of treatment plans." Hall appealed on December 3, 2013. The appeal was denied by Defendant Jane LaMoure on December 16, 2013.

310.   Hall affirmatively states he did not consent to Defendant Dr. Kohut's grabbing or moving his arm around in the manner he had, as noted in ¶¶289 and 290 above, nor did Dr. Kohut give Hall any advance warning of what he was about to do when he grabbed his arm.

311.   On October 11, 2013, Hall received a prescription medication for "Meloxicam" by Defendant Dr. Kohut, for the treatment of pain. By the next day, October 12, Hall noticed an outbreak of hives over his body. Hall continued taking the medication as prescribed until October 14, 2013. On the morning of October 15, 2013, Hall submitted a medical kite related to the medication and outbreak of hives.

312.    On October 16, 2013, Hall was seen by a nurse related to his reaction to the
medication Meloxicam.  After evaluation, the nurse referred Hall back to the
provider to discuss the issue.

313.    At some time after Defendant Dr. Kohut grabbed Hall's arm, as noted in
¶¶289 and 290 above, Hall reached out in a letter to the Montana Attorney
General ("A.G.") related to the matter and the level of care he was receiving
at the prison.  On October 15, 2013, the A.G.'s office replied by stating they
do not assist citizens with such matters.

314.    On October 8, 2013, Hall was seen by an unidentified nurse in response to
his October 7, 2013, medical kite (as noted in ¶306 above).  The nurse noted
feeling and hearing Hall's right shoulder crepitating.  The activity occurred
while Hall was demonstrating slight movements and asking the nurse to
notice the appearance of bulging at the top of his clavical, as if there is a
dislocation in the Acromioclavicular joint.

315.    On October 15, 2013, Hall reached to the Montana Supreme Court through a
petition for a writ of mandamus under Cause No. OP 13-0691, in an effort to
receive the medical treatment that was prescribed by the orthopedic
specialist (Dr. Pine), that MSP obtained for his care.

316.    In Hall's petition he asked the Court to mandate that MSP: (1) Immediately
provide Hall with physical therapy as prescribed by Dr. Jonathan Pine, D.O.,

79

of Pintler Surgical Specialists; (2) follow all subsequent medical orders prescribed by Dr. Jonathan Pine for the care and treatment of Hall's right shoulder; (3) to have personal supervision over MSP's medical personnel and administrative staff, to insure the same are providing the care prescribed by Dr. Jonathan Pine in an adequate and timely manner; and (4) to do any and all other things as the Court my require.

317.   After the Montana Supreme Court accepted as true statements made by the DOC attorney, without giving Hall any opportunity to object or correct the record (where the DOC attorney misrepresented Hall's position by stating that "Hall seeks to have [the] Court command the warden of MSP to 'command' the MSP medical staff to deliver health care services to Hall in a particular way, i.e., by transporting Hall to an outside third party provider who will perform the same exercises which Hall can perform at the prison"), and reframed his petition to mean that Hall was seeking the Court to compel "transporting him to a third party outside medical provider," the Montana Support Court denied the petition by stating that "Warden Kirkegard has no clear legal duty to provide treatment to Hall in a manner that has not been prescribed by a physical therapist or orthopedic specialist." Hall did not seek damages.

318.   On October 16, 2013, Hall was scheduled for a second PT session with Mr.

Spears. Prior to leaving the prison's grounds, MSP Transportation Officer

("T.O.") Neighbors radioed the Command Post to ask if he was authorized

to remove Hall's right arm from the restraints should the therapist so require.

Defendant Captain Michael Zuber ("Zuber") answered the request by

denying authorization. He further gave T.O. Neighbors orders that should

the therapist require Hall's right arm to be freed from the restraints, he is to

deny the request and immediately return Hall to the prison.

319.   After Hall was transported to Premier Physical Therapy, T.O. Neighbors

asked Mr. Spears if he will need to have Hall's right arm freed from the

restraints. When Mr. Spears answered affirmatively, T.O. Neighbors

explained that he was under orders to refuse and immediately return Hall to

the prison.

320.   Hall's PT session was then canceled. As Hall was being escorted out of the

PT office, he asked Mr. Spears to take note of the denial. Spears stated that

he would.

321.   After Mr. Spears indicated that he would make note of MSP's refusal to

allow Hall's right arm to be freed from his restraints for physical therapy, he

stated to Hall that his mother had called his office to request a copy of his

records. Hall replied by informing Mr. Spears that he sent his office a

Power of Attorney, naming his mother as his agent, and that he should have

81

received it by now. Mr. Spears responded by telling Hall that if he wants copies he will need to go through MSP and that he refuses to honor any power of attorney by prison inmates. Hall was then returned to MSP.

322.   Once at MSP, Hall immediately initiated an informal grievance against Defendant Zuber, complaining about interference with and denial of medical treatment. The grievance was denied by Defendant Hiedi Abbott on November 6, 2013, who stated that security overrides medical at all times. Hall immediately filed a formal grievance. Defendant Hiner responded by stating that communication with security on the importance of physical therapy and need for removal of the restrains was completed, and that Hall had been rescheduled. Hall appealed, which was denied by Defendant Redfern on December 4, 2013. Hall then appealed to the DOC Director. Defendant Batista denied the appeal on January 10, 2014.

323.   On October 21, 2013, after receiving notice that he failed to complete the "Action Requested" portion of his informal grievance, related to Dr. Kohut's technical assault against him (see ¶307 above), Hall rewrote his grievance and submitted it for processing. Defendant Abbott denied the grievance on November 4, 2013, stating, "The physician is trained to safely administer a physical exam. The physician must move, feel, hear & manipulate the joint in order to medically determine a further course of care. The physician will

not tolerate disrespect or bad behavior.

324.    In addition, on October 21, 2013, Hall initiated an informal grievance regarding MSP's medical department's failure to treat him for severe pain and suffering. G.C. Kristy Cobban refused to process the grievance on October 24, 2013, due to errors in the "Action Requested" section of the grievance form. On October 28, 2013, Hall re-filed his grievance. The grievance was denied by Defendant Hiner on November 12, 2013. Hall appealed, which was denied at the Warden's level on November 26, 2013, by Defendant Redfern; then again at the DOC Administrator's level on January 10, 2014, by Defendant Batista.

325.    On October 21, 2013, Hall was taken to see Defendant Dr. Kohut at the LHU-2 pilot medical exam room, related to his adverse response to the Meloxicam medication Dr. Kohut prescribed earlier for pain. (See ¶311 above). The meeting lasted under two minutes and consisted of Dr. Kohut merely informing Hall that he was discontinuing Meloxicam and replacing it with Ibuprofen, 400 mg tablets. Dr. Kohut refused to discuss any further issues with Hall related to his shoulder and ordered Sgt. Malcolm, the escorting officer, to immediately have him returned to his cell.

326.    On October 23, 2013, Hall sent Defendant Redfern an OSR requesting the identities of all the medical and administrative staff involved in his

treatment.  Hall also requested information related to whether he will be seen

by Dr. Pine as he previously prescribed.  Defendant Hiner answered the

OSR instead of Redfern, by requiring Hall order a copy of his medical file

from the Infirmary (copies are charged at .50 cents per page).  She also

reported that Hall was scheduled for physical therapy.

327.   On October 25, 2013, Hall sent a medical kite complaining of decreased

mobility and increased pain in his right shoulder with even the slightest of

movement.  Hall described the movements he was making and the

associated pain levels.  On October 26, 2013, Hall was seen by an Unknown

Doe (signature is unreadable, but the defendant may already be named).  The

defendant referred Hall to a provider.

328.   During the evaluation conducted by Unknown Doe in ¶327 above, the

female nurse stated to Hall that the reason why MSP does not provide

physical therapy and why it takes so long for inmates to be taken to outside

specialists is because MSP lack transportation staff.

329.   On October 30, 2013, Hall was transported from MSP to St. James Hospital

in Butte, Montana, for a MRI to be taken of his right shoulder.

330.   While at St. James Hospital and during preparations, in which a doctor

injected a dye into Hall's right shoulder, the doctor commented that he

noticed considerable inflammation and asked Hall if he was in pain.  Hall

replied that he has been suffering from severe pain and sometimes feels

suicidal as a result. The doctor commented that it is obvious there is pain

from the inflammation and apologized he could not help. He also stated the

injections should offer some relief for the time being.

331. After the MRI was taken, the technician commented to Hall that there

appears to be a prominent fracture with significant features.

332. On November 4, 2013, Hall was transported to Premier Physical Therapy,

where he under went PT for the first time since his initial PT session on

August 5, 2013. (See ¶¶141-149 above). This marked the passage of 91

days.

333. During the PT session noted in ¶332 above, Hall noted Defendant Spears

performing the same therapy administered on August 5, 2013. During the

session, as Hall attempted to communicate his problems, he noted Mr.

Spears as being unfriendly and unconcerned.

334. At the start of the session Hall tried to explain to Defendant Spears that his

arm does not move in the shoulder socket but instead his entire shoulder

moves. Mr. Spears responded by asking Hall what he means by that. When

Hall tried to explain, Mr. Spears state he is not sure he understands. Hall

asked to remove his shirt so Mr. Spears can witness for himself what is

happening when he tries to move his arm. Mr. Spears said no and instructed

Hall to just show him. When Hall stated he cannot see anything through his shirt, Mr. Spears stated that it does not matter. Mr. Spears then began the session. The session consisted of approximately 30 minutes of Mr. Spears moving Hall's arm in various directions before ending with approximately 10 minutes of tinge electro therapy.

335. On November 14, 2013, Hall sent a medical kite complaining that he was suppose to be seen by Dr. Pine within 4 to 6 weeks from August 29, 2013, after physical therapy. Hall further complained of continuing pain, extreme loss of mobility in his shoulder, and complications.

336. On November 15, 2013, Defendant Hiedi Abbott answered Hall's kite by stating, "You have an appointment scheduled with an MSP provider to discuss the results of your MRI & further plan of care. You need to be patient."

337. Also on November 14, 2013, Hall sent a second medical kite requesting to hear the results of the MRI taken on October 13, 2013 (noted at ¶329 above). Defendant Jane McMahon answered the kite on November 14, 2013, by confirming Hall was scheduled to meet with a provider on the matter.

338. On November 16, 2013, Hall sent a medical kite explaining that he was seen by Dr. Powell of Missoula for second opinion but was never told of the results. Hall requested consultation on the results of Dr. Powell's opinion.

Hall also sent a second medical kite asking why he was removed from specialty care in opposition to the previous orders of Pintler Surgical Specialists Dr. Pine.

339.    On November 19, 2013, C.O. Elmos and C.O. Melvin escorted Hall to the LHU-2 pilot medical exam room to be seen by Defendant Dr. Kohut. The meeting was being taken in reference to Hall's November 14 and 16 medical kites (as noted in ¶¶335-338 above).

340.    While Hall was being escorted to the LHU-2 pilot medical exam room, C.O. Elmos warned him that Dr. Kohut was being very confrontational with inmates and had upset a few already. C.O. Elmos asked Hall not to react to his antagonism and to stay calm.

341.    Dr. Kohut began the meeting by reading Hall's medical kites of November 14 and 16. After reading the kites, he signed each. He then pulled a report from Hall's medical file and began reading. After a few moments of reading, Defendant Dr. Kohut stated that it appears the fractured humeral head has healed but that Hall's shoulder has a condition known as (word undecipherable).

342.    When Hall asked Defendant Dr. Kohut to explain what the term he used meant, Dr. Kohut responded by telling him that it means he is not doing his physical therapy as told. When Hall replied by stating that he has only been

to physical therapy twice, Defendant Dr. Kohut stated that that is all he (Hall) needs. He then stated to Hall that he gave him specific instructions to perform PT on his own and even demonstrated how to do the exercises.

343.   When Hall told Defendant Dr. Kohut that he was doing the best he can with absolutely no assistance or guidance and trying to work through the extreme pain of a frozen shoulder and an arm that does not work, Dr. Kohut responded by stating that that is not what the MRI reads or the comments written by Mr. Spears. When Hall replied by asking Dr. Kohut what he means by that, Dr. Kohut responded by telling Hall that he is healed and that he (Dr. Kohut) is done. When Hall again asked Dr. Kohut what he means, Defendant Dr. Kohut stated that it means he (Hall) never did his physical therapy as told and that that's it.

344.   Hall responded by telling Defendant Dr. Kohut that he (Dr. Kohut) never followed the treatment plans of both Dr. Pine and Dr. Powell, and that he never received the necessary level of care expected for injuries like his. Dr. Kohut responded by stating that all the care Hall is entitled to is a diagnosis, X-Rays, and instructions for physical therapy and that that is what he got. He went further to state that inmates are not entitled to quality care or anything more than the bare minimum to insure life. Dr. Kohut then told C.O. Elmos to "get him out of here, we're done."

345.    After Hall was returned to his cell from meeting with Defendant Dr. Kohut,

he submitted a medical kite requesting to be rescheduled to discuss why

MSP prematurely discontinued specialty care with Dr. Pine; to hear the

results of Dr. Powell's second opinion; the results of the MRI; and to explain

any future plan of care with a provider who will treat him with dignity free

from derisive hostility, such as that of Defendant Dr. Kohut's.  Hall further

complained about his meeting with Dr. Kohut and his contentious demeanor;

explaining that Dr. Kohut's hostilities, disrespect, contempt, mistreatment

and abuse causes him great emotional stress.  Hall also stated that he refuses

to be the continued subject of Dr. Kohut's unethical turpitude.  On

November 20, 2013, Defendant Hiedi Abbott responded to Hall's kite by

stating, "You cannot choose the provider in which you are scheduled to see.

You can sign a refusal or request another staff member to be present during

the exam."

346.    On December 16, 2013, Hall was transported to Premier Physical Therapy

where he was met by Defendant Mr. Spears.  Hall noted that the session, the

third since his injury, lasted for approximately one hour and consisted of two

new exercises (the first are described in ¶146 above).  Hall also noted that

both of his hands were freed from his restraints.

347.    Hall noted that in his third physical therapy session, Mr. Spears raised his

(Hall's) arm straight forward and to the 11 O'clock position above his head, then back again. Hall immediately complained of strong pain and described a sensation that felt like a blunt object was jabbing into his ribs nearest his spine at the bottom tip of his scapula. Mr. Spears felt around the area and lowered Hall's arm but made no comment. He did not repeat the motion.

348.    Next, Mr. Spears took Hall by the elbow using his (Mr. Spears) left hand while placing his right hand on Hall's shoulder. Mr. Spears then began slowly moving Hall's arm into a circular motion. The activity immediately caused Hall to feel sharp, piercing pain inside his shoulder as if being cut by a knife, popping of the Acromioclavicular joint, and snapping sensations that Hall described as being like a rubber band rolling over bumps in his shoulder. Mr. Spears stated he could feel and hear the popping and crackling in Hall's shoulder. He told Hall that it was essential they work through it and that he will be gentle. He continued to move Hall's arm in the circular motion for approximately 10 minutes before having Hall move over to a bicycle like arm machine.

349.    After instructing Hall to use his arms to peddle in the forward position on the arm machine, which Hall did for approximately 5 minutes, Defendant Mr. Spears demonstrated four different directional pulling motions before instructing Hall to repeat them on his own for 10 repetitions each. After

Hall completed the exercise, Mr. Spears placed him on the tinge electric therapy machine for 10 minutes.

350.    At the end of the session, Defendant Mr. Spears asked Hall if he had access to a gym or a pulley machine. Hall replied that he only has access to a dayroom for one hour per day and that it only has a punching bag for exercising. Mr. Spears asked Hall if he could get access and Hall stated that he would kite medical to make the request. Mr. Spears stated that it is important that he (Hall) perform the pulley exercises at least once a day, if possible. Hall again stated that he will check with the prison about gaining access to the gym. The session then ended and Hall was returned to MSP.

351.    Also on December 16, 2013, after being returned to MSP from Premier Physical Therapy, Hall was seen by MSP Dr. Rantz for a follow-up related to physical therapy. During the visit, Dr. Rantz informed Hall that he only had two more PT visits scheduled and that she wanted to check-in with him to evaluate his progress and hear any concerns he may have. After Hall described his condition and concerns, Dr. Rantz provided no comments. Before the meeting ended, Hall asked why it took so long for PT to begin. Dr. Rantz stated she did not have that answer but will look into the matter further. The meeting then ended and Hall was returned to his cell.

352.    The next day, on December 17, Hall's shoulder swelled considerably and his

pain level increased to about 8 on the pain scale from 1 to 10. Hall's shoulder stiffened to where he could barely move it in any direction. For the following week Hall applied ice to control pain and swelling.

353.   On December 22, 2013, Hall sent a medical kite complaining of extraordinary pain and stiffness in his right shoulder. Hall also described a piercing pain that shoots into his humeral head and downward to his elbow. On December 23, 2013, RN A. Hanna replied to Hall's kite by stating that he will be scheduled to see a provider within five days.

354.   On December 26, 2013, Hall sent a medical kite inquiring about access to the gym to perform exercises assigned by the physical therapist.

355.   On December 27, 2013, Hall was transported to Premier Physical Therapy where he was met by Defendant Mr. Spears for his 5th PT session (since his injury).

356.   Before the PT session began, Hall explained the complications he experienced after his December 16, session. Defendant Mr. Spears explained to Hall that he can expect pain and swelling because each time he pushes his arm further, scar tissue is being broken up and moved around and muscles and tendons are being stretched. Mr. Spears encouraged Hall to keep pushing himself and to work through any pain, swelling, and stiffness.

357.   The 5th PT session consisted of Defendant Mr. Spears working Hall's arm in

the same three directions as described in ¶146 above, only when moving

Hall's arm upward in the forward position, he pushed further to the 12

O'clock position.  Mr. Spears then instructed Hall to perform the exercises

noted in ¶349 above.  After Hall completed the task, Mr. Spears added a new

task where Hall was instructed to lift a 1 lb weight in three different

directions (straight forward, at a 45-degree angle to his right side, then

straight outward to the right side).  Mr. Spears ended the session by placing

Hall on the tinge machine for 10 minutes of electro therapy.

358.   Before Hall was to be returned to MSP, Defendant Mr. Spears instructed he

do cable rows and dumbbell lifts at the gym at the prison at least once per

day, and continue to perform arm raises and stretches at least 4 times per

day.  Hall informed Mr. Spears that he put in a medical kite about access to

the gym (as noted in ¶350 above) and suggested that he (Mr. Spears) contact

Dr. Kohut himself on the matter.

359.   On December 30, 2013, Hall was escorted to the LHU-2 pilot medical exam

room where he was seen by Defendant Dr. Kohut.  When Dr. Kohut opened

the meeting, Hall believed it was related to his December 22nd medical kite

(as noted in ¶353 above), about the complications he was experiencing with

his shoulder at that time.  When Hall asked about the kite, Dr. Kohut stated

he knew nothing about it.  He instead produced Hall's December 26th

medical kite, related to his request to access the gym.

360. As to the matter related to accessing the gym, Dr. Kohut stated it was a security issue that he will not address. When Hall asked if he (Dr. Kohut) will make the necessary arrangements, Defendant Dr. Kohut said no. When Hall asked if he (Dr. Kohut) can at least provide a rubber band and 1 lb weights for use during his (Hall's) dayroom, Defendant Dr. Kohut again said no.

361. When Hall commented that he needed access to perform cable rows and weighted arm lefts, as instructed by Mr. Spears, Defendant Dr. Kohut stated to Hall that that is not his (Dr. Kohut's) problem and that Hall will have to figure it out for him self. Dr. Kohut then signed Hall's medical kite of December 26, 2013, and stated that he (Hall) will get a copy in the mail.

362. Before being escorted back to his cell, Hall asked Defendant Dr. Kohut if he will be seeing an orthopedic specialist again. Dr. Kohut stated that he cannot tell him that for security reasons.

363. On December 31, 2013, Hall initiated an Informal Grievance related to Defendant Dr. Kohut's refusal to arrange for Hall's access to exercise equipment necessary for his treatment. The grievance was denied on January 10, 2014, by Defendant Hiedi Abbott, who wrote, "Medical doe not become involved in security related issues. Medical must also follow

security procedures.  You have been provided education on self-exercises to do in your cell.  You have also been seen by physical therapy.  Comply with your treatment plan."

364.    On January 17, 2014, Hall advanced his grievance to the formal level.  On January 29, 2014, it was denied by Defendant Cyndy Hiner.  In addition to her comments, she stated that the outside consultant (believed to be Defendant Mr. Spears) did not notify MSP of any need for additional equipment for Hall's treatment plan.  On February 10, 2014, Hall appealed.  The appeal was denied by Unknown Doe (whose signature is undecipherable), then again by Defendant Batista on March 28, 2014.

365.    On January 8, 2014, Hall was transported to Premier Physical Therapy where he was met by Defendant MPT E. Shane Spears for his 6th PT session.  As a result of Dr. Rantz December 16th comments (see ¶351 above), Hall arrived at the session believing it was his last.

366.    The PT session began like the previous with Defendant Mr. Spears performing 3 assisted range of motion exercises, designed to push the limits of the range of motion in Hall's shoulder to break-up scar tissue, move it around in the shoulder, and to stretch the muscles and tendons.  This activity continued for 15 minutes before Hall was instructed to perform various other exercises on his own.

367.  During the assisted exercises and stretching, Hall again explained that when his arm is raised above his shoulder he feels like a blunt object is pressed very hard into his back where the bottom of his scapula is located. Mr. Spears commented that it is because his shoulder froze up between the times of the injury and when regular therapy began and that everything around the shoulder is compensating for the restrictions in the shoulder. Mr. Spears went further to explain that the sensations, along with the swelling and pain that follows after he pushes movements to their limits, will go away the more progress is made with physical therapy. When Hall asked how long would that be, Mr. Spears stated that an injury like his normally takes 6 to 8 months of physical therapy and that surgery may still be required.

368.  At the end of the session Hall informed Defendant Mr. Spears that according to his December 16, 2013, meeting with MSP's Dr. Rantz, he believes this is the last time he will be attending physical therapy. Mr. Spears commented that more physical therapy is required and that he will be recommending at least 4 to 6 more weeks. Hall was then returned to MSP.

369.  On January 15, 2014, Hall was being transported to Premier Physical Therapy when T.O. Neighbors thought to call Lieutenant Lamb, to ask if he can remove Hall's restraints should the physical therapist require. Lt. Lamb stated to T.O. Neighbors that he was unsure and needed to consult with

Captain Zuber. On a callback to T.O. Neighbors, Defendant Michael Zuber gave orders to T.O. Neighbors that he is not to remove the restraints from Hall for any reason. T.O. Neighbors then called Premier Physical Therapy to explain that Hall's restraints could not be removed and asked if he should bring him in any way. Mr. Spears said no. At that time, transportation turned the vehicle around and retuned Hall to MSP.

370.    Once back at MSP Hall immediately initiated an informal grievance against Lt. Lamb and Captain Zuber, complaining of interference with medical treatment. (This was the second time Defendant Captain Zuber refused to allow Hall's arm to be freed from his restraints in order to receive medical treatment. See ¶318 above.) The grievance was denied on January 30, 2014, by Defendant Hiedi Abbott who stated, "Medical does not override security procedures."

371.    On February 2, 2014, Hall advanced his informal grievance noted in ¶370 above to the formal level. On February 13, 2014, Hall appealed. Defendant Myron Beeson denied the appeal on February 26, 2014. On February 28, 2014, Hall again appealed. The appeal was denied on March 5, 2014, by Defendant Batista.

372.    On January 17, 2014, Hall was escorted to the main infirmary where he was met by MSP Dr. Perinian for a follow-up evaluation. Dr. Perinian opened

the meeting by explaining that MPT E. Shane Spears had reported progress in physical therapy but is recommending four (4) more weeks. Dr. Perinian then explained to Hall that the purpose of the meeting was to evaluate the need for additional physical therapy. He then asked Hall to describe his condition.

373.    Hall explained to Dr. Perinian all of the delays and interferences that he had been experiencing and how his shoulder was allowed to freeze up before physical therapy began on a consistent and regular basis. He complained of constant and persistent pain and that he believes something more is wrong with his shoulder but that he cannot get an adequate exam. Hall also complained about the treatment he was receiving from Dr. Kohut and asked that a new MSP doctor be assigned to provide care.

374.    Dr. Perinian stated to Hall that he wanted to focus on his shoulder and asked he (Hall) first describe any pain that he was experiencing and where. Hall described four points of pain. The first he described as being a very strong and pulsating ache between his right deltoid and bicep. He explained the pain increases to intolerable levels when he uses his bicep too much, picks up anything with any weight, or flexes his bicep. Hall also described a sensation that feels like a belt being tightened around his arm between his bicep and deltoid. He described the second point of pain to be in the

humeral head itself and explained he gets very sharp spikes of pain that shoot down his humerus to his elbow whenever he moves his arm too quickly or extends it out past 40% at a right angle. Hall described the third point of pain to be in the Acromioclavicular and glenohumeral joints and explained the pain as being a consistent and deep ache that pulsates in intensity, depending on how active he is with his exercises. Hall described the fourth point of pain to be in his back at the bottom of his right scapula and explained it as feeling like a blunt object is being jabbed with great force into his back. He explained the pain mostly occurs when he moves his arm upward past the shoulder level. Hall also explained that during movement he experiences a lot of popping that others can hear, crunching inside his shoulder, and what feels like rubber bands snapping inside the shoulder joint. He also complained that it seems his entire shoulder region moves during movement instead of his arm bone (humerus) in the shoulder joint.

375. After hearing Hall's descriptions, he (Dr. Perinian) asked Hall to demonstrate a series of movements. Hall asked if he can remove his shirt so that he (Dr. Perinian) can see how everything around the shoulder seems to be moving instead of his humeral head in the shoulder joint, as it should. For the first time since being injured, the observation was made. Dr. Perinian stated he has concerns about Hall's shoulder and will be referring

him to a specialist.

376.   At the close of the evaluation Hall complained to Dr. Perinian that MPT E.

Shane Spears assigned exercises that require access to a pulley machine and

one-pound weights.  Hall complained he is unable to exercise as directed by

Mr. Spears because he cannot get anyone to make the necessary

arrangements.  Dr. Perinian stated that it was up to security and that security

trumps medical.  The meeting ended and Hall was escorted back to his cell

in LHU-2.

377.   On February 2, 2014, after experiencing problems with unit staff requiring

he place his hands behind his back to cuff-up whenever being escorted to

yard or off the unit, which Hall complained caused him great pain, Hall sent

a medical kite requesting a Health Service Report ("HSR") alerting officers

of the severe restrictions in the range of motion in his right shoulder.

Defendant PA Gutherie Lewis denied the request by stating, "This is not an

HSR issue.  This needs to be addressed with security on your unit."

378.   After the Infirmary denied Hall's request to have a HSR issued to alert staff

about his shoulder and the need for special care when applying restraints and

during escorts, Hall brought the issue to the attention of Unit Manager Paul

Lucier ("Lucier"), as Defendant PA Gutherie implied in his response noted

in ¶377 above.  Lucier stated he will not post medical sensitive care

instructions on Hall's door, to alert staff, without a HSR.

379.   On February 3, 2014, Hall was transported to Premier Physical Therapy for a 7th PT session.  The appointment took Hall by surprise after he heard MSP's Dr. Rantz' comments of December 16, 2013 (noted in ¶251 above) that he only had two remaining PT sessions.  After Hall's January 17, 2014 meeting with Dr. Perinian (noted in ¶¶372-376 above), and after all the trouble he had with Defendant Dr. Kohut, Hall did not believe MSP would grant Mr. Spears request for additional PT sessions.  Incidentally, when Hall was taken to transportation he believed he was being transported to Dr. Pine's office instead.

380.   When Hall arrived at Premier Physical Therapy, he was dismayed at Mr. Spears' attitude toward him.  In an attempt to evaluate his demeanor, Hall asked Mr. Spears if he was OK.  Mr. Spears stated he was fine then proceeded to rush through the assisted stretching routine (as described earlier in ¶146 above), only in this session he skipped moving Hall's arm out to the side as he did in all previous sessions.

381.   During the assisted exercises, Hall suffered from a lot of painful popping in the Acromioclavicular joint and pain in the humeral head.  When asked, Mr. Spears stated simply that it was because Hall's muscles needed to be built up.  When Hall attempted to press Mr. Spears for a better explanation, he

stated it was an issue for the doctor.

382. After the assisted exercises, Mr. Spears instructed Hall to use the arm bicycle machine in the forward and reverse motions for five minutes each, before using the rubber band pulley for four sets of 10 reps. He then instructed Hall to perform arm lifts using a 2 lb weight for 12 reps before ending the session with tinge electro therapy.

383. On February 4, 2014, concerned about his condition and the lack of medical staff's willingness to keep him informed, Hall submitted a medical kite requesting to see an orthopedic shoulder specialist. Defendant McMahon answered the request on February 7, 2014, by informing Hall that he is scheduled.

384. On February 10, 2014, Hall was transported to his 8th PT session (or the sixth session since MSP began to schedule in regular PT meetings). During the session, Mr. Spears was more aggressive during the assisted exercises then previously. Hall's shoulder popped several times, loud enough for the T.O.'s accompanying him to hear, causing Hall enough pain that he lifted himself out of the therapeutic chair he was placed in. Hall noted that he has noticed Mr. Spears is not as sensitive and cordial with him as he is with other patients that he has witnessed Mr. Spears interact with.

385. Hall's impression that he was not a welcomed client of Mr. Spears was

102

being reinforced, to his perception, at each visit with Mr. Spears. This impression caused Hall to be concerned that he was receiving a lesser course of treatment and that little care was being given to his injury. Hall expressed that he believed he needed to be seen by a specialist by now, as first prescribed by Dr. Pine. Given the pain and increased popping in the Acromioclavicular join, Hall suspected he was beginning to experience the kind of complications that Dr. Pine warned him about during his July 15, 2013 examination (noted in ¶129 above).

386. When Hall expressed concern about the complications Dr. Pine explained, involving the Acromion and Acromioclavicular joint, Mr. Spears offered no comment. When Hall stated to Mr. Spears that Dr. Powell opined that providing PT achieves its goal, he should have 100% use of his shoulder without complications; Mr. Spears stated it will take about two years before anyone will be able to tell. Mr. Spears had nothing more to offer before instructing Hall to perform his exercise routine. The routine in this session was the same as that noted in ¶382 above.

387. On February 26, 2014, Hall sent a medical kite requesting a HSR for a bottom bunk. The request was being made after Hall learned that his custody was being reduced and that he would have to share a cell with a bunk bed with another inmate. In the request Hall wrote, "My custody is

being reduced to HSU-1 from LHU-II. I need a bottom bunk HSR so that I am not placing my R shoulder at risk of injury due to the severe restrictions in range of motion as a result of my injury, and the cleft left from the fracture of my humerus that catches my clavical. I still have no natural range of movement in my arm out to the side of my body, and at least 50% of my forward range is due to compensation from the structure around my shoulder's capsule. All movement is painful."

388.   On February 27, 2014, a VARIOUS UNKNOWN DOE, believed to be Defendant Lewis, responded to Hall's February 26, 2014, medical kite by stating that the request will be discussed at special needs. Hall noted this was a stark difference in response as opposed to his February 2nd HSR request (noted in ¶377 above).

389.   After Hall's February 10, 2014 PT session (as noted in ¶384 above), PT stopped. Hall was not rescheduled until March 24, 2015. Between that time Hall continued to experience pain and problems with his Acromioclavicular joint.

390.   On March 3, 2014, Hall submitted a medical kite complaining, "I need follow-up care for my shoulder. I still suffer pain during any movement, extremely limited movement, excessive popping, snapping, crunching, and stress on surrounding bones such as collarbone, clavical, shoulder blade, and

pressure on my ribs near the lower, inner tip of my shoulder blade. I still have zero movement outward to the side. ¶It seems all care has completely stopped, leaving me unable to use my right arm." The medical kite was answered by VARIOUS UNKNOWN DOE (whose signature is undecipherable but may be a named defendant) on March 4, 2014, by referring Hall to a provider.

391.  On March 4, 2014, Defendant Lewis issued a HSR restricting Hall to a bottom bunk as he requested on February 26, 2014 (see ¶387 above). The HSR was approved by VARIOUS UNKNOWN DOE (whose signature is undecipherable) on the same date noted.

392.  On March 10, 2014, Hall was seen by Defendant Dr. Kohut related to his medical kite dated March 3, 2014 (as noted in ¶390 above). At the meeting, Dr. Kohut had Hall restate the issues he described in his kite. He then stated to Hall that he needs a moment to review the physical therapists notes.

393.  After reviewing the notes of the physical therapist, Defendant Dr. Kohut stated to Hall that everything that can be done for him has been done and that he will have to learn how to live with the complications he is experiencing. Hall replied by explaining the pain he is suffering and their locations. Dr. Kohut responded by telling Hall that the pain and complications can be expected and again repeated that he needs to learn to

live with it.

394.   During the meeting, Hall noted Defendant Dr. Kohut's demeanor and persona as being confrontational and menacing.

395.   After Defendant Dr. Kohut finished telling Hall that he needs to learn how to live with the pain and the complications in his shoulder, Hall changed topics by asking why the prison denied Mr. Spears recommendation for continued physical therapy.  Dr. Kohut replied by stating that PT was not discontinued, it was just that the order ran out and that that is not the same as denying treatment.  Hall then reframed his question to ask why physical therapy was not re-ordered as Mr. Spears recommended.  Dr. Kohut had no reply. Instead, Hall observed him completing a series of tickets in his medical file.

396.   Defendant Dr. Kohut did not explain what he had written in Hall's file.  He instead stated to Hall that he will conduct a follow-up exam in two weeks and will do a better assessment at that time.  Dr. Kohut then asked Hall if he had anything further to discuss.

397.   Hall responded by asking Defendant Dr. Kohut if he had an appointment scheduled for a follow-up with Dr. Pine, as Dr. Pine previously prescribed. Dr. Kohut responded by stating that he did not know the answer to the question and does not have access to that kind of information.  He then excused Hall and had him escorted back to his cell.

398.    While being escorted back to his prison cell, C.O. Melissa Williams, one of
        the escorting officers, commented that Dr. Kohut is so bad that if he was her
        doctor she would kill herself.

399.    On March 21, 2014, Hall sent a medical kite complaining, "I've been
        experiencing considerable pain between my right bicep and deltoid. I
        recently noticed a serious adnormality [sic] in my bicep and believe either
        the tendon or muscle was torn or seriously damaged when I broke my R
        humeral head. This issue needs to be evaluated. I recently saw Dr. Kohut
        about my worsening condition, chronic pain, worsening complications in my
        shoulder, and inability to use my right arm. He did absolutely nothing,
        which is yet another serious problem I'm experiencing." RN Brand
        answered the medical kite on March 22, 2014, indicating that Hall was
        scheduled to see PT in 1-2 weeks.

400.    On March 24, 2014, Hall was transported to Premier Physical Therapy
        where he was met by Defendant Mr. Spears for a PT session. Prior to the
        session beginning, Hall brought to Mr. Spears' attention the abnormality he
        noticed in his right bicep. Mr. Spears observed Hall's right arm then had
        him press on his hand in an upward and downward motion, then side to side.

401.    After Hall performed the above noted tasks, Mr. Spears asked how long he
        (Hall) had the condition. Hall explained that he was not sure. Hall further

explained that he has been complaining that he believed something more was wrong for months on end but that no one would listen. Mr. Spears made no comment. When Hall pressed him further, Mr. Spears commented that he believes it has something to do with his tendons.

402. During the PT session, Mr. Spears concentrated on lifting Hall's arm upward to the side of Hall's body at a 45 degree and 90 degree angle. Mr. Spears also had Hall bend his arm at the elbow while he (Mr. Spears) lifted his elbow outward to the side. Hall complained of strong pain and pressure on his humeral head and acromion.

403. After Mr. Spears completed the assisted exercises, he instructed Hall stand sideways to the wall and walk his fingers up the wall. Hall was only able to walk his fingers up the wall until his arm was parallel with his shoulder...the stiffness in his shoulder would not allow him to go any further. Hall also noted that his entire shoulder was raised upward and movement stopped where there was no more room for compensation around the shoulder. At that point, Mr. Spears instructed Hall to let his arm down. At that instant, his shoulder popped loud enough to be heard by everyone in the room. Mr. Spears then instructed Hall to use his left hand to hold his right arm while he repeated the exercise.

404.    After repeating the task as instructed, Mr. Spears had Hall use the arm
        bicycle machine to perform forward and reserse rows for 4 minutes in each
        direction.  He then instructed Hall to use the rubber band pulley, then the 1
        lb weights for arm-lifts before ending the session with tinge electro therapy.

405.    On March 26, 2014, Hall was transported to Pintler Surgical Specialists to
        be seen by Defendant Dr. Pine.  Immediately at the start of the meeting Hall
        complained about the abnormalities he noticed in his right bicep and
        described the chronic pain he had been suffering.  He also described the
        history of the complications he had been experiencing with the treatment he
        was receiving and in his shoulder.  Dr. Pine conducted an exam at that time.

406.    The exam consisted of Dr. Pine first observing Hall's right bicep while
        instructing Hall move his arm by bending at the elbow.  He also asked Hall
        to grip his (Dr. Pine's) hand.  Dr. Pine then began to feel around Hall's
        bicep.  He also had Hall clench his fist and push up and down on his (Dr.
        Pine's) hand while he (Dr. Pine) applied opposing pressure.  Hall explained
        the associated tenderness and pain resulting from the exercises.

407.    After the exam, Defendant Dr. Pine explained to Hall that it appears he has a
        ruptured tendon and that it is not surprising given the nature of his shoulder
        injury.

408.    When Hall asked when and how the rupture occurred, Dr. Pine stated that it

is hard to tell because it was not part of his initial exam and he doesn't have access to the full range of tests that the prison had conducted.

409. Hall then asked Dr. Pine if the tendon and bicep could be fixed and if so, that he wanted it fixed. Defendant Dr. Pine explained that the injury could have been repaired but then opined that it was too late. He explained that the injury should have been repaired as close to the time of injury as possible.

410. Dr. Pine then went further to explain to Hall that even if the injury had been discovered in time, he would not have performed the operation because of the difficulty involved in working with tendons, which he explained to be like working with jello. He also explained that he only performs such difficult operations on high-end athletes who are young in their career. He stated that due to Hall's age and that he believes it is very unlikely that he (Hall) will need the full strength of his right arm, he would never perform the operation.

411. When Hall asked Dr. Pine if he would perform the operation if he (Hall) were a free citizen and regular patient, Dr. Pine stated that he would if his patient insisted. When Hall replied by stating that he insists, Dr. Pine stated that because he (Hall) is a ward of the state, he (Hall) cannot make that request and is not entitled to the same level of care he would receive had he

been a regular patient. Dr. Pine further stated that his only job is to conduct the exam and make recommendations.

412.    At that time, Dr. Pine turned to the transportation officers and asked if he can take X-rays of Hall's right shoulder. The T.O.'s attending to Hall stated that they did not see any reason why not. Hall was then escorted to the X-ray room where X-rays of his right shoulder were taken.

413.    After the X-rays were taken and Dr. Pine returned, he explained more physical therapy is needed and that he will be making that recommendation with the prison. He further explained that surgery may still be required but that he would not recommend it at Hall's age, unless he becomes active and needs the use of his shoulder. He explained to Hall that in his opinion, as long as he (Hall) is careful and remains mindful of the limitations in his shoulder, he should be able to live a normal life without too much discomfort.

414.    After hearing Dr. Pine's comments, Hall expressed concerns over the decisions being made about the quality of the remainder of his life in the use of his right arm and shoulder and took issue with Dr. Pine's decision to allow for a lesser quality of recovery. Hall complained that his status as a temporary ward of the state doesn't entitle him (Dr. Pine) or MSP to a make decisions that will permanently reduce the quality of his life to impairments

that can be avoided and that he should, at minimum, be provided the same level of care he would have received had he been a regular patient.  Dr. Pine responded by again telling Hall that he is a ward of the state and that he (Dr. Pine) is limited in what he can do.  He again told Hall that MSP controls everything.  Dr. Pine concluded by apologizing to Hall and wishing him good luck.  Hall was then returned to MSP.

415.   Immediately after being returned to MSP Hall initiated a series of grievances alleging abuse of prisoner, medical malpractice, failures to conduct proper medical examinations, and a litany of other complaints related to the level of care he was receiving for his shoulder injury.  Each grievance was denied to their end stage.  Hall believed the grievances were denied in the prison's attempt not to admit any liability.

416.   On March 31, 2014, Hall was taken to the LHU-2 pilot medical exam room to be seen by Defendant Dr. Kohut.

417.   After Defendant Dr. Kohut entered the pilot exam room Hall observed him open a file before commenting, "Let me see here…shoulder pain."  He then commented, "Let me read what the therapist had to say."  He then began humming to himself as he thumbed through Hall's medical file.  After a few moments of thumbing through pages, Hall observed Dr. Kohut fixed on a page and began mumbling incoherently.  When he stopped mumbling, he

looked Hall in the eye and said, "OK!" At that time, Hall began to explain
that he had been taken to see Dr. Pine who opined that the tendon in his right
bicep had ruptured. Dr. Kohut commented, as if surprised, "It did!" Hall
said yes and went on to ask Dr. Kohut why he didn't see it in the MRI. Hall
complained that his bicep is permanently damaged and that this explained
why he has been suffering such serious pain all this time and having such a
difficult time using his right arm.

418.    As Hall continued expressing his concerns, Defendant Dr. Kohut began
        thumbing through his file and started humming again. He then stopped to
        ask Hall when he was seen by Dr. Pine. Hall replied by telling him that it
        was on March 24th. Dr. Kohut then stated that Dr. Pine's report is not in the
        file. Dr. Kohut concluded by stating he is rescheduling the appointment
        until he is able to read what Dr. Pine had to say. Hall was returned to his
        cell at that time.

419.    On April 1, 2014, Hall sent an OSR to Defendant Cathy Redfern requesting
        information to help him understand the relationship between MSP, Pintler
        Surgical Specialists, and Dr. Pine. The request was made in preparation for
        taking legal action.

420.    On April 7, 2014, Defendant Cathy Redfern answered Hall's OSR (noted in
        ¶418 above) by stating, "There is no contract with Pintler Surgical

Specialists. The State of MT/DOC refers inmate patients to outside

specialists if medically necessary/indicated. MT/DOC does not control or

restrict the practice of outside specialists." Hall noted this response to be in

opposition to statements made by Dr. Pine claiming that MSP controlled

everything (see ¶¶205 and 206).

421.    In addition, on April 1, 2014, Hall sent an OSR to G.C. Billie Reich asking

about Dr. Pine's relationship with MSP. At issue was Hall's intention to sue

Dr. Pine over his failure to conduct an adequate exam, leading to the

permanent loss of the tendon to Hall's right bicep. G.C. Billie Reich

responded by stating, "I don't know if he's under contract with MSP—you'd

need to ask that [undecipherable] by submitting OSR to Cathy Redfern. ¶In

my opinion Dr. Pine is outside the jurisdiction of MSP. I would return a

grievance not processed if you were specifically grieving Dr. Pine."

422.    On April 9, 2014, Hall sent a medical kit asking why PT was cancelled or

not rescheduled. In his kite, Hall further complained, "Both MPT E. Shane

Spears and specialist orthopedic surgeon Dr. Pine have determined that

continued PT is definitely necessary and have recommended the same since

MSP stopped scheduling appointment. [sic]  Also, both have stated the level

of PT care being scheduled IS NOT normal. I am still a long way from

recovery and essentially unable to [sic] anything more than hold a cup or

write.  My arm doesn't even swing normally when walking like my left does or before my injury.  Dr. Kohut keeps putting off follow-up assessments."

423.   Two days later, on April 11, 2014, Hall sent an OSR to Defendant Cathy Redfern requesting information as to who was responsible for diagnosing and treating his shoulder injuries.  In the OSR Hall wrote, "Sorry to bother you again.  I'm writing with regard to Dr. Pine v. Dr. Kohut.  The purpose is to try to attempt to determine who was responsible for examining and diagnosing the extent of my injuries when I broke my shoulder.  The reason is because I had also suffered a severe rupture of the tendon to my R bicep, which I discovered on my own.  Since the discovery, Dr. Kohut has repeatedly refused to conduct any kind of examination to determine the nature and extent of the injury, and the precautions I need to take (treatment needs).  Dr. Pine merely confirmed the tendon is ruptured through a cursory exam but did not schedule anything further.  He merely stated he will not repair the rupture because I'm not an athlete and don't [sic] strength in my arm.  So my question is who was responsible for conducting the full range of tests to determine the extent of my injury?  What capacity in the diagnoses and treatment of my injuries did Dr. Pine hold?  Who is responsible?"

424.   On April 14, 2014, Defendant Cathy Redfern responded to Hall's April 11th OSR by stating, "Dr. Kohut is a family practice physician.  Dr. Pine is an

orthopedic specialist, trained in diagnosing and making recommendations for orthopedic injuries."

425.   On April 3, 2014, Hall's custody was reduced and his housing changed from LHU-2, maximum security, to High Side Unit One ("HSU-1"), medium high security.  The change resulted in a situation where instead of Dr. Kohut going to LHU-2 to see Hall in the unit, Hall went to the Infirmary. However, due to unusual security considerations being made for Hall by the HSU-1 Unit Manager, whenever Hall left his housing block the unit or high security compound was being cleared of all inmates and Hall was being subjected to staff escorts to and from his travel passes.  Hall complained this was being done in retaliation for filing his suit under Hall v. Kirkegard, et al., CV 14-00011-H-DLC (D. Mont, March 3, 2014).

426.   On April 18, 2014, C.O. Josh Hotellen ("Hotellen") arrived at HSU-1 to escort Hall to the Infirmary for an appointment with Dr. Kohut.  This was an unusual practice at that time as inmates housed in HSU-1 on the High Side Management Program ("HSMP") were normally allowed to walk to the Infirmary on their own.  Before C.O. Hotellen left the unit to escort Hall to the Infirmary (Hall was not in restraints), security had ordered a clock down of all inmates in HSU-1.  Security also ordered the entire High Security Compound be cleared of all inmates before Hall was to be allowed to walk

to the Infirmary. Again, this was being done in response to Hall filing suit under Hall v. Kirkegard, et al., CV 14-00011-H-DLC (D. Mont, March 3, 2014).

427.    As C.O. Hotellen was accompanying Hall to the Infirmary, Hall explained Dr. Kohut's attitude toward him in past encounters and asked C.O. Hotellen to be present in the exam room as a witness. C.O. Hotellen denied Hall's request by stating that that is not his job. He stated his only job was to escort him (Hall) to the Infirmary and back again.

428.    Once at the Infirmary and after Dr. Kohut appeared, Dr. Kohut himself asked C.O. Hotellen to be present in the exam room. C.O. Hotellen denied Dr. Kohut's request for the same reason he stated to Hall and told Dr. Kohut to get a nurse instead. Dr. Kohut stated he needed C.O. Hotellen for security reasons and insisted he accompany him in the exam room. Hall interjected by stating that he believes it is necessary that security stand in for his (Hall's) protection. C.O. Hotellen reluctantly entered the exam room with Hall.

429.    After entering the exam room and ordering Hall to sit on the exam table, Dr. Kohut exploded. He was upset about Hall's April 9th medical kite and accused him of being highly disrespectful. He told Hall that he was sick and tired of all his kites and grievances and said that they needed to stop. Hall

117

stated that he won't stop until he starts receiving proper care and accused Dr.

Kohut of using his (Hall's) injury as an opportunity to punish and torture

him. Hall stated that he believes a veterinarian treats a dog better than the

treatment he has received and accused Dr. Kohut of causing his right bicep's

tendon to rupture, by making him perform PT exercises that Dr. Powell

opined he shouldn't have been doing and purposely subjecting him to a

hodgepodge patchwork of treatment that caused his shoulder to freeze and

prolonged his pain and suffering. Hall ended by telling Dr. Kohut that he

intends to contact the ACLU.

430.   Dr. Kohut responded by telling Hall that he studies the law and knows what

to do to keep the ACLU off his back. He went further to tell Hall that he

doesn't care about lawsuits because the State takes care of it all and they

don't affect him.

431.   Hall then turned to C.O. Hotellen and told him that he needs medical help,

that he has a serious shoulder injury and is in constant pain. Hall

complained this is the only treatment Dr. Kohut provides and that it has to

stop. C.O. Hotellen then intervened by stating the meeting is done and

ordered Hall out of the exam room.

432.   As C.O. Hotellen was accompanying Hall out of the Infirmary, Hall

explained that what just happened is exactly why he needed him in the exam

118

room.  Hall pleaded with C.O. Hotellen that he is in pain with an injured
shoulder and really needs help…he needs to see a doctor.

433.    Just before exiting the Infirmary, C.O. Hotellen stopped and ordered Hall to
sit in the Infirmary lobby while he went back into the exam room to speak
with Dr. Kohut.  Hall then heard C.O. Hotellen and Dr. Kohut arguing.  At
one point, Hall heard Dr. Kohut tell C.O. Hotellen not to tell him how to do
his job.  Hall then heard C.O. Hotellen threaten to report the incident to the
Command Post and write-up Dr. Kohut for staff misconduct.  Hall then
noticed both went silent.  Moments later C.O. Hotellen exited the exam
room and asked Hall if he wanted to go back in.  Hall said he did but did not
want to be attacked by Dr. Kohut like that.  C.O. Hotellen assured Hall that
this time it will be different.  Hall agreed and went back into the exam room.

434.    After Hall went back into the exam room, Dr. Kohut apologized but then
started to chastise Hall again over his grievances.  Hall cordially asked all
feelings be set aside.  Dr. Kohut paused, looked at C.O. Hotellen for a
moment, and then said yes.  He then proceeded to examine Hall's right
bicep.

435.    After a brief exam, Dr. Kohut determined that the tendon to the outer bicep
muscle in Hall's right arm was completely torn away.  He described Hall's
muscle as being curled back like a banana peal.  When Hall asked Dr. Kohut

to explain in better detail, Dr. Kohut pointed to an illustration poster on the wall of the exam room.

436.   After describing the injury to Hall, Dr. Kohut stated that he understands why he (Hall) has been complaining so much.  He stated that he can't imagine how difficult it has been or the pain involved.  He went further to explain that he understands the problems Hall was having with simple things such as lifting a cup or trying to put on his cloths.  He acknowledged that Hall must still be suffering from severe pain and needs help when moving his arm.  He then stated that he will be updating the physical therapist and will do more to help facilitate recovery.

437.   Dr. Kohut then asked Hall what kind of pain medication he has been taking. When Hall explained that he (Dr. Kohut) has refused to address the issue, Dr. Kohut immediately stated that that is about to change.  He then stated that he is prescribing Tramadol, twice daily or once every 12 hours.

438.   Dr. Kohut then went back to his personal issues and commented that each time they (Dr. Kohut and Hall) meet he (Hall) files grievances against him. Hall stated that all he is seeking is adequate and proper care and humane treatment.  He explained that he has been suffering great pain and degrading care and since no-one will listen or help, the grievance system is all he has. Dr. Kohut told Hall his treatment will improve when he stops grieving.  Hall

agreed he will stop filing grievances and will stick to medical kites when he has issues.

439. The meeting between Hall and Dr. Kohut then concluded with Dr. Kohut stating that he wanted to help. Dr. Kohut stated that he will be contacting Dr. Pine to discuss his condition and updating the physical therapist. He also stated that he will make sure that he (Hall) begins treatment for pain at the next pill pass.

440. Later that evening, the evening of April 18, 2015, Hall began taking Tramadol for pain. The regimen continued for 14 days until May 1, 2014, at which time the prescription abruptly ended without notice to Hall.

441. In addition, per his agreement with Dr. Kohut and in hopes to receive better medical care, Hall stopped filing grievances and instead began directing his medical kites to Dr. Kohut personally. This practice continued until September 8, 2014, at which time Hall once again began to turn to the grievance process for help.

442. On April 24, 2014, Hall sent a medical kite to request medical staff apprise unit staff of his medical condition. In the kite Hall wrote, "I need unit security to be made aware of the severe restrictions of movement in my shoulder and ruptured tendons to my right bicep so they understand the pain I suffer when I'm cuffed behind my back, and so they understand that

tugging and pulling on my right arm causes pain and may cause injury. I am not disruptive, combative nore [sic] do I pose problems. I'm being held in PHC pending an investigation that IS NOT related to disciplinary. I don't want to experience any more pain that I'm already suffering, or suffer any unnecessary injury." Defendant UNKNOWN DOE (whose signature is indecipherable) responded on April 25, 2014 by stating, "You will have to discuss this with your unit. It's not a medical issue."

443.   Hall noted unit staff have repeatedly refused any medical related considerations without being notified via HSR by medical staff.

444.   On May 1, 2014, Hall sent a medical kite specifically addressed to Defendant Dr. Kohut. In the medical kite Hall asked, "What risk do I face of the tendon in my inner bicep also rupturing? What precautions do I take to reduce the risk. ¶I remember in our last discussion your stating that your tendon can rupture at any time due to your shoulder injury and I've been worried ever since. The remaining tendon in my R bicep seems really strained and becomes painful when I flex (which I don't do anymore). ¶Your advice will be greatly appreciated. I'll see you at my next follow-up." Dr. Kohut responded on May 5, 2014 by stating, "I cannot answer that question specifically. Let's see what physical therapy will offer."

445.   At the time Defendant Dr. Kohut made his comment in ¶444 above, Hall

was not being seen by any physical therapist and hadn't been seen since March 24, 2014 (see ¶400 above).

446.   On May 4, 2014, Hall sent a medical kite specifically addressed to Defendant Dr. Kohut related to pain management, physical therapy, and follow-up care. In the kite Hall wrote, "For some reason the pain management program you put me on (Tramadol x2 daily) stopped on 5-2-14 and was not refilled. This unfortunately came at a time when my body finally adjusted to the medication. Please check into this for me. ¶Also, PT has long been approved but never scheduled. March 24, 2014, was my last PT session. Since then ruptured tendon in my R bicep had been discovered. I understand the therapist is being updated on that issue. Please check into this to insure Dr.'s orders are being followed." On May 12, 2014, Dr. Kohut responded by stating, "Your Prescription expired. ¶Also the Physical Therapist will see you when he has an available appointment."

447.   Hall noted that he began to suffer withdraws from the Tramadol after the prescription stopped, that felt like mild electrical shocks through his nervous system. On May 13, 2014, Hall was placed back on Tramadol, twice daily, for the treatment of pain. The prescription ran uninterrupted for 22 days before medical staff failed to deliver his evening dose on June 3, 2014. The next morning, doses were administered on schedule for another 5 days

before the prescription again ran out.  The last dose was administered on June 8, 2014 at 8:30 pm.  The interruption caused Hall to again feel a withdraw from the drug that he noted feeling like electricity was shocking his nervous system.

448.   Also on May 13, 2014, Hall sent a medical kite requesting to know why physical therapy had not been rescheduled.  On May 14, 2014, Defendant Dr. Kohut responded by stating, "Please be patient."

449.   On May 16, 2014, after Hall was placed back in LHU-2, he sent an OSR to U.M. Paul Lucier requesting a note to be placed on his cell door advising security staff of the limitations in his R shoulder and to handcuff him in front during escorts.  In the OSR Hall explained, "Dr. Kohut stated the Infirmary cannot issue an HSR because this is a security issue that is up to the Unit Manager.  Relief staff taking me to yard wont listen and don't care about the pain I suffer or that I can suffer additional injuries.  Any other time I'm cuffed in front with belly chains, so it's not an issue.  However, relief sergeants, such as Graham and the one who worked Saturday, do their own thing regardless of what staff regulars say."

450.   On June 4, 2014, U.M. Paul Lucier responded to Hall's May 16th OSR (noted in ¶449 above) by stating, "I was finally able to get an answer on this. Mrs. Hiner, the Director of Nursing told me that hand cuffing you behind

your back will not cause any further injury to your shoulder.  There is no medical need to change the way you are restrained when you go to yard."

451.   On May 21, 2014, after a delay of 58 days between sessions, Hall was transported to Premier Physical Therapy for his 10th session since Dr. Pine first ordered PT.  Before the session began, Hall asked Defendant Mr. Spears if he had been updated by Dr. Kohut on his (Hall's) ruptured tendon.

452.   In response to Hall's question noted in ¶451 above, Defendant Mr. Spears stated that he had not been updated by Dr. Kohut.  He further commented that he had figured something more was going on.  He then began PT as he had on all previous occasions.

453.   After Hall was returned to MSP, he immediately sent a medical kite specifically addressed to Dr. Kohut.  In the medical kite Hall wrote, "I saw MPT E. Shane Spears on Wed., May 21[st], and asked if he had been updated on my ruptured tendon.  He said that he had not but did suspect something more was going on with my shoulder.  In our last meeting you had indicated that the therapist would be updated.  Will you please insure that is done so I can get his evaluation as to what my limitations are, and what I need to avoid to prevent additional injuries."  On May 28, 2014, Defendant Dr. Kohut responded by merely stating, "Noted."

454.   On May 28, 2014, Hall was transported to Premier Physical Therapy for a

PT session with Defendant Mr. Spears. Hall noted that at this session Mr. Spears had two other clients that he was also attending to. Hall observed one on the tinge, electro therapy device, while Mr. Spears was physically assisting the other. After waiting for about 5 minutes, Mr. Spears met with Hall and instructed he perform the self-administered exercises noted previously. Mr. Spears did not perform any of the assisted exercises as he did at the start of all previous sessions.

455.  After Hall completed the exercises he was instructed to perform (on the bicycle arm rowing machine, rubber band pulley, and arm raises using a 2 lb weight) Defendant Mr. Spears instructed he perform a set of new exercises on a machine with adjustable weights of 10 lb increments. Hall was unable to use the device and complained of strong pain between his right bicep and deltoid. Mr. Spears told Hall to skip the exercise and instead placed him on the tinge electro therapy device for 10 minutes.

456.  At the end of the PT session Hall asked Defendant Mr. Spears for advice on the condition of his injuries and the long-term outcome. Hall first asked about the chronic pain he was experiencing before asking about the remaining tendon holding his bicep in place.

457.  As to the issue of pain Hall noted that Defendant Mr. Spears explained that he believed the shooting pain that Hall described as feeling like a nail being

driven into his humerus is the result of tissue and nerves being pinched between the bone that fractured and was off-set, and the clavicle. He opined that the aching pain is the result of his (Hall's) deformed humeral head pushing on tissue in the shoulder capsule. Mr. Spears stated that physical therapy should help that over time, but that it will take a long time for therapy to stretch the surrounding tissue and tendons.

458.    On the issue of tendons Mr. Spears opined that the long (outer) bicep ruptured. He said the pain and weird sensations that Hall reports is due to the nerves still trying to work, and the muscle still trying to work. He said the nerve will eventually stop sending singles and the pain will go away over time, but that it will take a long time. As for the remaining tendon, Mr. Spears opined that there is a chance that it too will rupture and that Hall should avoid any sudden movements. Mr. Spears stated to Hall that any exercising should start out slowly, carefully, and with light weight or resistance while building up strength over time. Mr. Spears further opined that if the remaining tendon does rupture it will be fixed since the whole bicep would be disconnected. As for the tendon that did rupture, Mr. Spears opined it is too late for it to be repaired. He stated to Hall that ruptured tendons should be repaired early on. The PT session then ended and Hall was returned to MSP.

459.    On June 4, 2014, Hall was transported to Premier Physical Therapy where

he was met by Defendant Mr. Spears.  The session began as usual with Mr.

Spears taking control over Hall's right arm and moving it in various

directions.  In this session, Mr. Spears added a new range of motion by

instructing Hall to relax his arm to the side then bend at the elbow with his

hand pointing straight forward.  He then placed a hand on Hall's right

shoulder.  With his other hand, Mr. Spears took hold of Hall's elbow.  He

then began gently raising Hall's elbow outward to the side of his body at a

90-degree angle.  As Mr. Spears began working Hall's shoulder, he (Hall)

yelped in pain.  Mr. Spears then stopped.  The motion being exercised was in

the exact direction that places the displaced portion of the fractured humeral

head against the outer tip of Hall's Acromion.  Hall noted he has no natural

motion in that direction and his shoulder does not function well.  Mr. Spears

then instructed Hall complete his self-administered exercises before ending

the session with 10 minutes of tinge electro therapy.

460.    On June 6, 2014, Hall sent an OSR to U.M. Lucier regarding his request for

a notice to be posted on his cell door advising staff of his shoulder injury.  In

the OSR, Hall wrote, "Pertaining to my request for an advisory notice on my

door regarding my right arm and shoulder, I suggest you contact my

therapist Mr. E. Shane Spears (846-7770), who is THE trained specialist

128

perfectly aware of my severe motion limitations, the newly diagnosed ruptured tendon completely disconnecting the long muscle in my right arm, the high risk of the remaining tendon rupturing, the nerves that are pinched by certain movements in my shoulder, the excessive popping, snapping, crunching in my shoulder during movements, etc., and also contact Dr. Kohut instead of someone who is not a specialist currently treating my condition, is not trained in my kind of injuries, has never examined me, and who has most likely overstepped her qualifications. The restraint behind my back causes strong pain and places officers at risk of injuring my shoulder. I'm already being treated with prescription strength meds. The restraint is excessive given my condition." On June 6, 2014, U.M. Lucier responded by stating only, "I talked to the Director of Nursing about this." Incidentally, U.M. Lucier refused to place any advisory notice on Hall's cell door cautioning security staff of his injuries.

461.    On June 8, 2014 at 8:30 p.m., Hall was visited by a nurse at cell side for pill pass. The nurse notified Hall that his prescription order had expired and that the dose she was administering was the last.

462.    On June 9, 2014, Hall sent a medical kite addressed to Defendant Dr. Kohut stating, "My prescription for pain management (Tramadol) has expired and needs to be revisited. Also, MPT E. Shane Spears has indicated that the

chronic piercing pain that feels like a rod being driven into my shoulder down my humerus to my elbow is most likely a pinched nerve. Certain movement causes it to spike sharply. He also stated that the pain between my R bicep and shoulder is likely due to the added stress on the remaining tendon and that it's coming from it trying to compensate for the ruptured tendon. He stated signals are still being sent to the muscle and it's trying to perform tasks that it's no longer able to perform. What can be done to help me?" Dr. Kohut responded by writing, "Do your exercises as directed. You will always have some degree of pain from your injuries?" Nothing more was offered.

463.   On June 9, 2014, beginning around 3:00 p.m., Hall began to experience withdrawal symptoms from Tramadol. He noted experiencing painful electrical shocks throughout his nervous system that caused the muscles in his body to jerk, nausea, anxiety, depression, hot and cold spells, fast heart beats, cold hands and feet, sweating, and suicidal thoughts. The symptoms became worse as the night progressed. Hall was unable to sleep.

464.   On the morning of June 10, 2014, Hall's prescription for Tramadol was renewed and he was administered a dose at 4:35 a.m. Within 30 minutes the withdraw symptoms he was experiencing stopped. Hall did not grieve the incident in fear of treatment being stopped. He did note that this was the

second time his medication was interrupted abruptly and without notice or any step-down period, to prevent withdraws.

465.     On June 11, 2014, Hall was transported to Premier Physical Therapy where he was met by Defendant Mr. Spears. In this session, Mr. Spears instructed Hall to let his right arm relax down to his side. He then instructed Hall to bend his arm at the elbow until his hand was pointed straight forward. With Hall's elbow kept stationary at his side, Mr. Spears pulled Hall's hand outward to an approximate 40-degree angle. He then placed a hand on Hall's shoulder and with the other, he moved Hall's elbow upward out to the side. (This is a different direction than noted in ¶459 above where instead of Hall's hand pointed straight forward before his elbow was lifted outward to the side, his hand was pulled off to the side at a 40-degree angle). Hall noted that this is the direction that causes the most pain and pressure on his humeral head, and which he is completely unable to move on his own. As Mr. Spears began working Hall's arm, he cautioned him to relax and expect pain. He also explained the exercise is needed to rearrange displaced bone fragments and break-up scar tissue in that area of the shoulder. After Mr. Spears completed his work, he instructed Hall perform a series of exercises on his own before concluding the session with 10 minutes on the tinge electro therapy device.

466.    On June 19, 2014, Hall was escorted to the main Infirmary by C.O. Hotellen
(last name may possibly be Hansen instead of Hotellen) where he was met
by Defendant Dr. Kohut for a follow-up evaluation.  Dr. Kohut opened by
stating, "Good news!  Your therapist said you're making good progress.  I'm
scheduling 3 more sessions and after that I'll be leaving you to your own
devices."

467.    Hall responded to Defendant Dr. Kohut's comments by explaining that he
seems to be making good progress in the forward direction only, but not to
the side.  When Hall explained that he is unable to move his arm out to the
side of his body on his own and that it is extremely painful, Dr. Kohut
interjected by stating that he has little movement.  Dr. Kohut then went on to
state to Hall that he'll always be limited in that direction and feel pain due to
the nature of the fracture, and that he'll have to learn how to live with it for
the rest of his life because the prison wont be fixing the problem.  Fearing a
confrontation was being incited, Hall kept his silence.  Dr. Kohut concluded
the meeting by telling Hall that what ever success is achieved by the next 3
PT sessions will be all.

468.    In addition to Tramadol, Hall was also taking Ibuprofen (400 mg tablets) 3
times daily for pain.  The medications began to give him strong
stomachaches over time.  As a result, on July 2, 2014, Hall sent a medical

kite complaining of the problem.  Defendant Thornton refused to offer any treatment other than to give Hall a blister pack of Tums tablets and instruct he take them as directed.

469.    On July 5, 2014, after his stomachaches worsened and stools turned black, Hall sent a second medical kite complaining of stomachaches.  On July 6, 2014, he was seen by RN UNKNOWN DOE who referred him to a provider. The RN also ordered fecal smear kits to be administered to test Hall's stools for blood.

470.    On July 11, 2014, the Infirmary failed to deliver Hall's 4:00 a.m. dosage of Tramadol.  The interruption caused him to begin to experience the same withdraw symptoms as previously noted in ¶463 above.

471.    On July 21, 2014, Hall was escorted to the LHU-2 pilot medical exam room where he was met by Defendant Dr. Kohut related to his July 5, 2014 medical kite (as noted in ¶469 above).  At the meeting, Hall presented Dr. Kohut with a medical kite dated July 21, 2014, requesting to discuss alternative pain management options for his shoulder.  Hall described how Tramadol is not working well to treat his pain but has not complained because it does help him tolerate the pain better.  Hall also complained that Tramadol makes him nauseous and causes anxiety, which seems to be increasing and at times makes him feel like panicking.  Hall also explained

that at times he suffers electrical shocks throughout his nervous system, as well as severe withdraw symptoms when there are interruptions between doses.  Hall complained the side effects of the medication are beginning to outweigh the benefits.

472.   After hearing Hall's concerns (as note in ¶471 above), Defendant Dr. Kohut commented that he wont be discussing pain management during the current visit.  He then stated that he will schedule another appointment in two weeks and will discuss pain management options at that time.

473.   On August 4, 2014, Hall was escorted to the LHU-2 pilot medical exam room where he was met by Defendant Dr. Kohut to discuss pain management options other than Tramadol.  At the meeting, Dr. Kohut reported to Hall that Tramadol had recently been reclassified as a controlled substance (narcotic).  Hall stated that he doesn't know what that means then went on to explain how the medication is not working well for the treatment of his pain.  Hall also described how the drug makes him nauseous and causes anxiety, and how the side effects seem to be increasing the more he takes the drug.  He also expressed concerns about addiction and the terrible withdraws he experiences when dosages are missed.  After hearing Hall's concerns, Dr. Kohut asked him to describe the pain he was experiencing in more detail.

474.  Hall provided a detailed description of the points of pain and intensity levels, along with a list of activities that cause his pain levels to increase. In the clavical, Hall complained of a pressure like pain that he described as being located approximately one to two inches along the clavical towards his neck. He explained the pain as being constant and increases in intensity when ever he moves his arm even slightly out to the side of his body. He described the strongest and most bothersome points of pain as involving the Acromioclavicular joint, Acromion, and Glenohumeral joint. Hall explained the pain as being constant and rated its intensity between 4 and 6 on the pain scale, with occasional bouts reaching as high as 7 to 9. He also explained pain present between his right bicep and deltoid and described it as feeling like a strong Charlie horse, or like he was punched very hard or hit with a solid object. He described the pain as being constant and rated it the same as described earlier. He added that sometimes, especially during quick movements or when he flexes his bicep, that he feels a sharp, needle like piercing pain at the top of his bicep muscle. In addition, Hall described a pain that runs down the surgical neck of the humerus as feeling as if a rod is being driven down the center of his arm bone from the shoulder to his elbow. He explained the pain to be unpredictable but seems to occur when the fracture point in his humeral head catches the Acromion bone in his

shoulder. The final point of pain Hall described involved the bottom part of his Scapula. He explained the pain as feeling like someone was pressing blunt object very hard into his back nearest his spine.

475. After hearing Hall's description, Defendant Dr. Kohut asked him if he is Hepatitis C ("Hep C") positive. After Hall confirmed that he was Hep C positive, Dr. Kohut stated that he was going to order a viral load count to see if the virus is still active. He also asked Hall if he was undergoing any treatment for the disease. Hall answered no. Dr. Kohut stated that the reason why he is asking is that Tylenol is the only option he can offer to treat pain and that the medication is especially harmful to people with Hep C.

476. After hearing Dr. Kohut's comments, Hall explained the withdraw symptoms he suffers from Tramadol and asked he step down off the drug over time instead of being abruptly cut off or switched to another medication. Defendant Dr. Kohut stated that that would not be necessary because he is not taking him off Tramadol. He said the only other option was Tylenol and that he won't switch Hall to the medication because of his Hep C status and the effects the drug has on the liver.

477. When Hall asked Defendant Dr. Kohut if there is anything else at all to help with pain, he said none that the prison will approve. He said the reason for

this is because MSP does not treat inmates for pain.  When Hall stated his

situation is serious and makes him question if his life is worth the pain, Dr.

Kohut stated he understands the pain but that Tylenol is the best that can be

offered.

478.   After realizing nothing was being achieved, Hall asked about physical

therapy and mentioned that it was ordered long ago but never scheduled.

Defendant Dr. Kohut stated that it was ordered and told Hall to stop

complaining.  Hall replied by stating that he is not complaining, just asking.

Dr. Kohut replied by stating it will happen when it happens.  Hall was then

dismissed and returned to his cell.  Incidentally, despite Dr. Kohut's claim

that he was scheduled, Hall never received any further PT.

479.   On August 15, 2014, Hall received notice that his Tramadol (Ultram)

prescription was being changed to extended release and will only be

receiving one dose per day.  The notice informed Hall to expect the change

starting the week of August 18th 2014.

480.   Worried about side-effects and withdraws, on August 16, 2014 Hall sent a

medical kite requesting to discuss his concerns about the changes ordered in

the administration of Tramadol (Ultram).  On August 19, 2014, Defendant

UNKNOWN DOE (whose signature is indecipherable but who may be a

named defendant) responded by informing Hall that he is being scheduled to

see Dr. Kohut to discuss the issue.  UNKNOWN DOE also commented that the extended release will be a better choice and that Hall won't have to worry about withdrawal.

481.   On August 20, 2014, Hall began taking the new extended release version of Tramadol.  Between August 20th and September 7th 2014, the medication was administered only once daily during the 4:00 a.m. hour.

482.   On August 25, 2014, Hall was escorted to the LHU-2 pilot medical exam room where he was met by Defendant Dr. Kohut.  The purpose of the appointment was to discuss his Hep C infection, which Dr. Kohut described as being "on the move."  When Hall asked what that meant, Dr. Kohut stated that his viral load has risen from 2.5 million from his last test to 4.5 million in the current test.

483.   After discussing Hall's Hep C infection, Hall asked about changing his pain medication from Tramadol to Tylenol.  Defendant Dr. Kohut plainly stated no without offering anything further.  Hall then mentioned that he is taking the new extended release version of Tramadol, or Ultram.  Dr. Kohut commented, "Yeah!  Pretty good stuff isn't it."  Hall stated he just started taking the medication and does not have an opinion, but that he still feels a lot of pain.  Dr. Kohut merely stated "Good luck" then left the exam room without saying anything further.  Hall was then returned to his cell.

484.   On September 7, 2014, Hall was notified by nurse UNKNOWN DOE that his prescription for Tramadol expired and instructed that he re-kite medical for a refill.  The nurse administered Hall's last dose at 4:10 a.m.

485.   On September 8, 2014, Hall submitted a medical kite complaining that his prescription for Tramadol expired on September 7th and requested renewal or provide treatment for withdrawal ASAP.  In the kite Hall explained, "I'm suffering withdraw now.  ¶My last dose was on 9-7-14 @ 0410 hours.  I did not receive a dose on 9-8.  Today, as the day waned forward, I began experiencing hot/cold spells, very cold hands & feet, fast hear beats for periods, stronger than usual nausea to feelings of vomiting, a strange electricle [sic] pulsation throughout my nervous system, and weakness (muscles feel exhausted).  My pain levels in my R arm and shoulder have increased in intensity slightly, but noticeably.  I experienced this before and Dr. Kohut stated it's withdraw.  I specifically asked MSP avoid having me suffer withdraw with treatment."  On September 9, 2014, UNKNOWN DOE (whose signature is indecipherable but may be named as a defendant) replied by stating, "I spoke with the provider regarding your decision to no longer be on tramadol because of the symptoms you experience after the order expired.  The provider said there was no medication we could give you to stop these symptoms.  If you no longer wanted tramadol, they would have to

139

run its course. Please kite if you change your mind on the tramadol or your symptoms worsen."

486.  Hall noted that he did not mention any where in his medical kite the desire to be abruptly taken off Tramadol. He specifically and repeatedly requested to step down from the medication to avoid withdrawal.

487.  On September 8, 2014, Hall sent a second medical kite complaining of a breakout with hives. On September 9th Hall was seen by Defendant UNKNOWN DOE (whose signature is indecipherable but may be named as a defendant) who refused to treat his condition.

488.  On September 10, 2014, Hall submitted a medical kite complaining, "I am still suffering withdraw from Tramadol and haven't been able to sleep for over 70 hours due to electric shocks to my nurvous [sic] system that cause my body to spasm. All other symptoms the same. It's torture." Defendant UNKNOWN DOE (whose signature is indecipherable but may be named as a defendant) replied by stating, "Pt seen by nurse yesterday [undecipherable] Provider consulted Re this issue. At that time Pt denied wanting Tramadol back and provider stated he could not do anything for the withdraw but could place pt back on Tramadol. 40 yrs, 130 lbs, 97.4, 78, 989, 16, 133/86. Pain 5/10. States he wants to go back on Tramadol so he can be weaned off it to avoid withdraw. [Undecipherable] will consult MD. Pt noted to be

shaking intermittently during interview.  *Consulted Dr. Kohut, stated he

would restart med if wanted but would not start to have tapered.

[Indecipherable] 3 days off already.  Please re-kite with any further needs."

489.    On September 15, 2014, not caring if the defendants retaliate by

substantially reducing the level of care for his serious medical condition, as

they had previously done, and while keeping in mind his agreement with

Defendant Dr. Kohut, related to the filing of grievances, Hall initiated an

Informal Resolution against Defendants Dr. Kohut, Hiedi Abbott, Cindy

Hiner, and Cathy Redfern; for the interruptions in the administration of the

pain medication he was prescribed and the associated seriously painful and

debilitating withdrawals he suffered as a result.  On October 3, 2014,

Defendant Hiedi Abbott denied the grievance.  Hall noted she answered the

grievance in violation of policy, as a named person for which the grievance

concerned.  Hall followed through to the formal grievance level on October

15, 2014, which was answered by Defendant Cindy Hiner on October 27th.

Hall again noted she answered the grievance in violation of policy, as a

named person for which the grievance concerned.  On November 6, 2014,

Hall appealed.  The appeal was denied by Defendant Cathy Redfern on

December 5th.  Hall again noted she answered the grievance in violation of

policy, as a named person for which the grievance concerned.  On January 5,

2015, Hall again appealed.  The final appeal was granted on April 9, 2015 at the DOC Administrative level.

490.   On September 28, 2014, Hall submitted a medical kite complaining, "My R shoulder is showing signs of structural abnormalities that are worsening.  I have long complained about the severe restrictions in the range of movement of my humeral head in the rotary cup before the surrounding structure begins to give way in compensation to allow greater range.  This limitation and the resulting unnatural compensation by the surrounding structure has been extremely painful and agonizing.  I'm now seeing what appears to be structural deformations at the top of my shoulder where my collar bone joins or connects to my shoulder.  Also, the physical therapy that was ordered was never completed and I've received absolutely no follow-up care."

491.   At the time Hall submitted his September 28, 2014, medical kite he believed Dr. Kohut and his staff (or cohorts) either stopped treatment or severally reduced the level of care as the result of his grievance.  (See ¶¶426-441 above).

492.   On September 29, 2014, RN UNKNOWN DOE responded to Hall's September 28th medical kite as noted in ¶490 above, stating "You will be scheduled to see a provider."

493.   On October 6, 2014, Hall sent a medical kite complaining, "I request to

have the problems I've complained about involving my right shoulder to be evaluated by a shoulder specialist before I suffer additional permanent injury that may be avoidable." Hall's medical kite was answered on October 7, 2014, by UNKNOWN DOE (whose signature in indecipherable but who may be a named defendant) who stated, "Assessed – physical therapy notes indicate improvement. Dr. Pine – ortho notes no further treatment. Treatment at this time is to continue exercises. If you don't do exercises you can develop frozen shoulder. This is entirely up to you to do."

494. On October 6, 2014, Hall was escorted to the LHU-2 pilot medical exam room where he was met by Defendant Dr. Kohut in response to his (Hall's) September 28, 2014 medical kite (as noted in ¶¶490-492 above). At the meeting, Hall explained his trouble with pain, limited mobility, excessive popping and snapping, and the onset of what he believed to be abnormalities with the structure and alignment of the bones in his Acromioclavicular joint. After Hall provided a description of his problem, Dr. Kohut asked if he can move his (Hall's) arm around to evaluate his condition. Dr. Kohut stated that he would be careful to move his arm gently and try not to cause him any unnecessary pain. When Hall agreed, Dr. Kohut ordered the escorting officers to remove Hall's right arm from the belly-chain handcuff that it was bound to. Dr. Kohut then took control of Hall's right arm and began to

143

move it in various directions.

495. During the evaluation, Hall squirmed with each painful point. Dr. Kohut stated that he was able to feel considerable popping and the displacement of tissue inside the shoulder as he was rotating Hall's arm. He then stated to Hall that he must learn to live with the condition for the rest of his life and that there is nothing more he can do. When Hall commented that he cannot believe that he (Dr. Kohut) allowed such barbarous care to result in such a poor recovery, Dr. Kohut stated that he's done then walked out of the exam room and ordered the officers to "take him out of here." Hall was then returned to his cell.

496. Immediately after the meeting with Dr. Kohut, Hall filed a grievance against him and UNKNOWN DOE for the denial of medical care. The Informal Resolution was denied by UNKNOWN DOE on October 24, 2014. Hall advanced the grievance to the formal level on November 4, 2014, which was later denied on November 13th by Defendant Cindy Hiner. Hall appealed on November 20th, which was again denied by UNKNOWN DOE on December 9, 2014. On January 5, 2015, after being transferred to an out of state prison located in South Dakota, Hall appealed to the final level. The appeal was answered on April 9, 2015 (which Hall noted as being out of time per MSP/DOC policy) by Connie Winner, Clinical Services Administrator for

144

the MDOC.

497.    On November 10, 2014, Hall was escorted to the pilot medical exam room in LHU-2 where he was met by Defendant Dr. Kohut related to his September 15, 2014, grievance regarding the mismanagement of the administration of Tramadol for pain management (as referenced at ¶489 above). Hall noted the meeting was very brief and ended with Dr. Kohut again stating to Hall that he must learn to live with his condition for the rest of his life.

498.    On December 9, 2014, Hall was transferred to an out of state prison located in South Dakota to serve out the remainder of his Montana sentences. He has not received any treatment since.

499.    On June 16, 2015, Hall had X-rays taken of his right shoulder at the South Dakota State Penitentiary ("SDSP"). On July 1, 2015, nursing staff at SDSP reported to Hall that the X-rays showed mild degenerative features in the Acromioclavicular joint and Acromion. The nurses further reported that they do not have Hall's medical records related to his shoulder from MSP and therefore cannot comment any further.

## V. CLAIMS FOR RELIEF

500.    The actions of defendant Beeson, Fode, and Myotte of failing to provide Hall with training and instruction in the handling and clean-up of hazardous materials, while using Hall to perform Haz-Mat clean-up work details on

occasions when the prison Haz-Mat work crew was not available or imposed an inconvenience for prison staff, constitutes deliberate indifference or reckless disregard for Hall's health and safety as proscribed by the Eighth Amendment to the United States Constitution.  The same further constitutes a state created danger to health and safety, negligence, and prisoner abuse under Montana state law.

501.   As a result of Beeson, Fode, and Myotte's failure to provide Hall with training and instruction in the handling and clean-up of hazardous materials, while using Hall to perform Haz-Mat clean-up work details on occasions when the prison Haz-Mat work crew was not available or imposed an inconvenience for prison staff, Hall was placed at an unreasonable risk of danger to his health and safety by the work conditions imposed upon him and was otherwise injured, and suffered great pain of body and mind in an amount to be determined at trial.

502.   The refusal of defendants Beeson, Wood, Fode, and Myotte to provide or make available to Hall the proper equipment with which to work, while instructing Hall to perform clean-up duties requiring proper and safe equipment to reach high places, constitutes deliberate indifference or reckless disregard for Hall's health and safety as proscribed by the Eighth Amendment to the United States Constitution.  The same further constitutes

a state created danger to health and safety, negligence, and prisoner abuse under Montana state law.

503.   As a result of Beeson, Wood, Fode, and Myotte's failure to provide Hall with proper safety equipment with which to work, while instructing Hall to perform work details requiring the same, Hall was placed at an unreasonable risk of danger to his health and safety by the work conditions imposed upon him and was otherwise injured, and suffered great pain of body and mind in an amount to be determined at trial.

504.   The actions of defendants Fode and Myotte of instructing Hall to use a chair, rolling table, and/or the cement slabs used as a bed, table, and stool and the all-in-one metal sink and toilet in the prison cells in LHU-2 at MSP to reach high places for cleaning, while instructing Hall to perform such work details, constitutes deliberate indifference or reckless disregard for Hall's health and safety as proscribed by the Eighth Amendment to the United States Constitution.  The same further constitutes a state created danger to health and safety, negligence, and prisoner abuse under Montana state law.

505.   As a result of defendants Fode and Myotte's actions of instructing Hall to use a chair, rolling table, and/or the cement slabs used as a bed, table, and stool and the all-in-one metal sink and toilet in the prison cells in LHU-2 at MSP to reach high places for cleaning, Hall was placed at an unreasonable

147

risk of danger to his health and safety and was otherwise injured, and suffered great pain of body and mind in an amount to be determined at trial.

506.    The failure of VARIOUS UNKNOWN DOE's to immediately transport Hall to an adequately staffed hospital or medical care center with an orthopedic surgical specialist on staff, after emergency-room medical personnel at the Deer Lodge Community Medical Center informed VARIOUS UNKNOWN DOE's that Hall needed to be seen by an Orthopedic Surgical Specialist as soon as possible for the treatment of a fractured humeral head in Hall's right shoulder, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, and prisoner abuse under Montana state law.

507.    As a result of VARIOUS UNKNOWN DOE's gratuitous two-day delay in transporting Hall to an adequately staffed medical care center with an Orthopedic Surgical Specialist on staff, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

508.    The failure of defendant Samantha Peterson and/or VARIOUS UNKNOWN DOE's to provide Hall with pain medication prescribed by a qualified medical professional at the Deer Lodge Community Medical Center for the

treatment of Hall's severe pain, by substituting the prescribed Loratab medication with the lesser effective Tramadol without a qualified physician's order, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

509. As a result of defendant Samantha Peterson and/or VARIOUS UNKNOWN DOE's substituting the prescribed Loratab medication for the treatment of Hall's severe pain with the lesser effective Tramadol without a qualified physician's order, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

510. The refusal of defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's to allow for a CT or CAT scan of Hall's fractured right humeral head, as requested by the orthopedic surgical specialist MSP obtained to diagnose and treat Hall's serious medical needs, by denying the request and ordering Hall's immediate return to Montana State Prison so that defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's can meet amongst themselves to determine the approval of costs, thus interfering with Hall's access to medical care and treatment for non-medical reasons and causing an additional six-day delay in treating Hall's serious medical needs, constitutes

deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

511. As a result of defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's actions or inactions, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

512. The failure of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, P.A. Fisk, Mark Henderson, Jane McMahon, Pamela Ward Monaco, Leslie Thornton, Rosanna Hengst, Dan Curran, Gutherie Lewis, Lance Griffin, Samantha Peterson, and/or VARIOUS UNKNOWN DOE's to carry out the medical orders prescribed by Orthopedic Surgical Specialist Dr. Jonathan Pine, who was obtained by the defendants for the treatment of Hall's right fractured shoulder, to have Hall remain in an arm immobilizer for two more weeks after July 5, 2013, or until the week of July 29, 2013, then begin a three week course of gentle range of motion physical therapy for three weeks before being returned to Dr. Pine's office for a re-evaluation during the sixth week nearest August 19, 2013, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes

negligence, neglect, malpractice, and prisoner abuse under Montana state law.

513. As a result of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, P.A. Fisk, Mark Henderson, Jane McMahon, Pamela Ward Monaco, Leslie Thornton, Rosanna Hengst, Dan Curran, Gutherie Lewis, Lance Griffin, Samantha Peterson, and/or VARIOUS UNKNOWN DOE's failure to carryout the prescribed treatment recommended by Orthopedic Surgical Specialist Dr. Jonathan Pine, or their interference thereof, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

514. The denial, delay, interference and/or failure of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, VARIOUS UNKNOWN DOE's to provide Hall with continuous physical therapy, as prescribed by an orthopedic surgical specialist obtained by the defendants for the diagnoses and treatment of Hall's serious medical condition, by waiting until Hall's shoulder began to freeze up, or became frozen, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

515.    As a result of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy

Redfern, VARIOUS UNKNOWN DOE's denial, delay, interference and/or

failure to provide Hall with continuous physical  therapy, as prescribed by an

orthopedic surgical specialist obtained by the defendants for the diagnoses

and treatment of Hall's serious medical condition, by waiting until Hall's

shoulder began to freeze up, or became frozen, Hall suffered unnecessary

and wanton infliction of great pain of body and mind in an amount to be

determined at trial.

516.    The deliberate and intentional replacement of physical therapy by a qualified

medical physical therapist, as prescribed by the medical physical therapist

obtained by the defendants to treat Hall, by defendants Trisdan Kohut, Hiedi

Abbott, Cyndy Hiner, Cathy Redfern, VARIOUS UNKNOWN DOE's, with

self-administered exercises using alternative instructions given by Defendant

Trisdan Kohut, for the purpose to avoid professionally administered and

supervised physical therapy, constitutes deliberate indifference to Hall's

serious medical needs in violation of the Eighth Amendment to the United

States Constitution.  The same further constitutes negligence, neglect,

malpractice, and prisoner abuse under Montana state law.

517.    As a result of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy

Redfern, VARIOUS UNKNOWN DOE's actions of replacing physical

therapy administered by a qualified medical therapist with self-administered exercises, using alternative instructions given by Defendant Trisdan Kohut for the purpose of avoiding professionally administered and supervised physical therapy, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

518.    The failure of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's to inquire further into Hall's reports of severe pain and the ineffectiveness of the medication Tramadol being used to treat his pain, which Hall complained was making him suicidal, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution.  The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

519.    As a result of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's failure to inquire further into Hall's reports of severe pain and the ineffectiveness of the medication Tramadol being used to treat his pain, which Hall complained was making him suicidal, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

520.    The repeated delays of Defendant Trisdan Kohut and/or VARIOUS

UNKNOWN DOE's in seeing Hall with constant severe pain constitutes deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

521.   As a result of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's repeated delays in seeing Hall for his constant severe pain, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

522.   The repeated delays of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's in seeing Hall for his complaints related to his serious medical needs, because he was complaining and filing grievances, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution; as well as retaliation for free speech in violation of the First Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

523.   As a result of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's repeated delays in seeing Hall for his complaints related to his serious medical needs, because he was complaining and filing grievances,

Hall suffered unnecessary and wanton infliction of great pain of body and mind, and was physically and mentally harmed in retaliation for exercising the right of free speech, in an amount to be determined at trial.

524. The intentionally inference with prescribed medical treatment by Defendant Michael Zuber, by refusing to allow Hall's right arm to be freed from restraints in a manner that would enable the attending medical physical therapist to administer treatment, when Hall posed no threat to himself or others, constitutes deliberate indifference to Hall's serious medical needs, as well as the excessive use of force, in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, excessive use of force/restraints, technical assault and battery, neglect, and prisoner abuse under Montana state law.

525. As a result of Defendant Michael Zuber refusing to allow Hall's right arm to be freed from restraints in a manner that would enable the attending medical physical therapist to administer treatment, when Hall posed no threat to himself or others, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

526. The denial of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Jane Lamoure, and Mike Batista to provide Hall with access to gymnasium time or the exercise equipment

155

necessary to enable him the ability to perform prescribed physical therapy rehabilitation treatment for his right shoulder, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

527.    As a result of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Jane Lamoure, and Mike Batista denial of providing Hall access to gymnasium time or the exercise equipment necessary to enable him the ability to perform prescribed physical therapy rehabilitation treatment for his right shoulder, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

528.    The failure of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's to monitor and manage the continuous administration of Hall's pain medication, causing gratuitous interruptions in dosages resulting in painful withdrawals that were dangerous to Hall's health, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state

law.

529.    As a result of the gratuitous interruptions in dosages in the administration of

Hall's pain medication and associated withdrawals, caused by the failures of

Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's, Hall

suffered unnecessary and wanton infliction of great pain of body and mind

in an amount to be determined at trial.

530.    The intentional refusal of Defendant Trisdan Kohut to taper or step-down the

dosage of Tramadol to prevent or lessen the effects of withdrawal that

extended over 3 days and placed Hall's health in danger, constitutes

deliberate indifference to Hall's serious medical needs in violation of the

Eighth Amendment to the United States Constitution.  The same further

constitutes negligence, neglect, malpractice, and prisoner abuse under

Montana state law.

531.    As a result of Defendant Trisdan Kohut's refusal to taper or step-down the

dosage of Tramadol to prevent or lessen the effects of withdrawal that

extended over 3 days and placed Hall's health in danger, Hall suffered

unnecessary and wanton infliction of great pain of body and mind in an

amount to be determined at trial.

532.    The failure of defendants Trisdan Kohut, Jonathan Pine, Stephen Powell, E.

Shane Spears, and VARIOUS UNKNOWN DOE's to conduct an adequate

and proper exam of Hall's right shoulder injuries, resulting in the failure to detect, diagnose, and treat Hall's ruptured tendons to his outer right bicep while knowing such an injury is common to a fractured humeral head, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

533.    As a result of Trisdan Kohut, Jonathan Pine, Stephen Powell, E. Shane Spears, and VARIOUS UNKNOWN DOE's to conduct an adequate and proper exam of Hall's right shoulder injuries, resulting in the failure to detect, diagnose, and treat Hall's ruptured tendons to his outer right bicep while knowing such an injury is common to a fractured humeral head, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

534.    The failure of defendants Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Leroy Kirkegard, Jane Lamoure, and Mike Batista to act on Hall's numerous reports and grievances of neglect and issues of complaints related to dangerous working conditions, staff negligence and neglect, and concerns for the treatment he was receiving related to his serious medical needs, constitutes deliberate indifference to Hall's serious

medical needs in violation of the Eighth Amendment to the United States Constitution. The same further constitutes negligence, neglect, and prisoner abuse under Montana state law.

535. As a result of defendants Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Leroy Kirkegard, Jane Lamoure, and Mike Batista to act on Hall's numerous reports and grievances of neglect and issues of complaints related to dangerous working conditions, staff negligence and neglect, and concerns for the treatment he was receiving relate to his serious medical needs, Hall suffered unnecessary and wanton infliction of great pain of body and mind in an amount to be determined at trial.

## V. RELIEF REQUESTED

WHEREFORE, Stacy G. Hall requests that this Court grant the following relief:

A. Issue a declaratory judgment stating that:

536. The actions of defendant Beeson, Fode, and Myotte of failing to provide Hall with training and instruction in the handling and clean-up of hazardous materials, while using Hall to perform Haz-Mat clean-up work details on occasions when the prison Haz-Mat work crew was not available or imposed an inconvenience for prison staff, violated Hall's Eighth Amendment to the United States Constitution. The same further constituted a state created

danger to health and safety, negligence, and prisoner abuse under Montana state law.

537. The refusal of defendants Beeson, Wood, Fode, and Myotte to provide or make available to Hall the proper equipment with which to work, while instructing Hall to perform clean-up duties requiring proper and safe equipment to reach high places, violated Hall's Eighth Amendment to the United States Constitution. The same further constituted a state created danger to health and safety, negligence, and prisoner abuse under Montana state law.

538. The actions of defendants Fode and Myotte of instructing Hall to use a chair, rolling table, and/or the cement slabs used as a bed, table, and stool and the all-in-one metal sink and toilet in the prison cells in LHU-2 at MSP to reach high places for cleaning, while instructing Hall to perform such work details, violated Hall's Eighth Amendment to the United States Constitution. The same further constituted a state created danger to health and safety, negligence, and prisoner abuse under Montana state law.

539. The failure of VARIOUS UNKNOWN DOE's to immediately transport Hall to an adequately staffed hospital or medical care center with an orthopedic surgical specialist on staff, after emergency-room medical personnel at the Deer Lodge Community Medical Center informed VARIOUS UNKNOWN

DOE's that Hall needed to be seen by an Orthopedic Surgical Specialist as soon as possible for the treatment of a fractured humeral head in Hall's right shoulder, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, and prisoner abuse under Montana state law.

540. The failure of defendant Samantha Peterson and/or VARIOUS UNKNOWN DOE's to provide Hall with pain medication prescribed by a qualified medical professional at the Deer Lodge Community Medical Center for the treatment of Hall's severe pain, by substituting the prescribed Loratab medication with the lesser effective Tramadol without a qualified physician's order, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

541. The refusal of defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's to allow for a CT or CAT scan of Hall's fractured right humeral head, as requested by the orthopedic surgical specialist MSP obtained to diagnose and treat Hall's serious medical needs, by denying the request and ordering Hall's immediate return to Montana State Prison so that defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's can meet amongst themselves to determine the approval of costs, thus interfering with Hall's

access to medical care and treatment for non-medical reasons and causing an additional six-day delay in treating Hall's serious medical needs, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

542.   The failure of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, P.A. Fisk, Mark Henderson, Jane McMahon, Pamela Ward Monaco, Leslie Thornton, Rosanna Hengst, Dan Curran, Gutherie Lewis, Lance Griffin, Samantha Peterson, and/or VARIOUS UNKNOWN DOE's to carry out the medical orders prescribed by Orthopedic Surgical Specialist Dr. Jonathan Pine, who was obtained by the defendants for the treatment of Hall's right fractured shoulder, to have Hall remain in an arm immobilizer for two more weeks after July 5, 2013, or until the week of July 29, 2013, then begin a three week course of gentle range of motion physical therapy for three weeks before being returned to Dr. Pine's office for a re-evaluation during the sixth week nearest August 19, 2013, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

543.   The denial, delay, interference and/or failure of defendants Trisdan Kohut,

162

Hiedi Abbott, Cyndy Hiner, Cathy Redfern, VARIOUS UNKNOWN DOE's

to provide Hall with continuous physical therapy, as prescribed by an

orthopedic surgical specialist obtained by the defendants for the diagnoses

and treatment of Hall's serious medical condition, by waiting until Hall's

shoulder began to freeze up, or became frozen, violated Hall's Eighth

Amendment rights to the United States Constitution. The same further

constituted negligence, neglect, malpractice, and prisoner abuse under

Montana state law.

544.    The deliberate and intentional replacement of physical therapy by a qualified

medical physical therapist, as prescribed by the medical physical therapist

obtained by the defendants to treat Hall, by defendants Trisdan Kohut, Hiedi

Abbott, Cyndy Hiner, Cathy Redfern, VARIOUS UNKNOWN DOE's, with

self-administered exercises using alternative instructions given by Defendant

Trisdan Kohut, for the purpose to avoid professionally administered and

supervised physical therapy, violated Hall's Eighth Amendment rights to the

United States Constitution. The same further constituted negligence,

neglect, malpractice, and prisoner abuse under Montana state law.

545.    The failure of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN

DOE's to inquire further into Hall's reports of severe pain and the

ineffectiveness of the medication Tramadol being used to treat his pain,

which Hall complained was making him suicidal, violated Hall's Eighth
Amendment rights to the United States Constitution.  The same further
constituted negligence, neglect, malpractice, and prisoner abuse under
Montana state law.

546.	The repeated delays of Defendant Trisdan Kohut and/or VARIOUS
UNKNOWN DOE's in seeing Hall with constant severe pain violated Hall's
Eighth Amendment rights to the United States Constitution.  The same
further constituted negligence, neglect, malpractice, and prisoner abuse
under Montana state law.

547.	The repeated delays of Defendant Trisdan Kohut and/or VARIOUS
UNKNOWN DOE's in seeing Hall for his complaints related to his serious
medical needs, because he was complaining and filing grievances,
constitutes deliberate indifference to Hall's serious medical violated Hall's
First Amendment and Eighth Amendment rights to the United States
Constitution.  The same further constituted negligence, neglect, malpractice,
and prisoner abuse under Montana state law.

548.	The intentionally inference with prescribed medical treatment by Defendant
Michael Zuber, by refusing to allow Hall's right arm to be freed from
restraints in a manner that would enable the attending medical physical
therapist to administer treatment, when Hall posed no threat to himself or

others, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, excessive use of force/restraints, technical assault and battery, neglect, and prisoner abuse under Montana state law.

549. The denial of defendants Trisdan Kohut, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Jane Lamoure, and Mike Batista to provide Hall with access to gymnasium time or the exercise equipment necessary to enable him the ability to perform prescribed physical therapy rehabilitation treatment for his right shoulder, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

550. The failure of Defendant Trisdan Kohut and/or VARIOUS UNKNOWN DOE's to monitor and manage the continuous administration of Hall's pain medication, causing gratuitous interruptions in dosages resulting in painful withdrawals that were dangerous to Hall's health, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

551. The intentional refusal of Defendant Trisdan Kohut to taper or step-down the

dosage of Tramadol to prevent or lessen the effects of withdrawal that extended over 3 days and placed Hall's health in danger, violated Hall's Eighth Amendment rights to the United States Constitution. The same further constituted negligence, neglect, malpractice, and prisoner abuse under Montana state law.

552. The failure of defendants Trisdan Kohut, Jonathan Pine, Stephen Powell, E. Shane Spears, and VARIOUS UNKNOWN DOE's to conduct an adequate and proper exam of Hall's right shoulder injuries, resulting in the failure to detect, diagnose, and treat Hall's ruptured tendons to his outer right bicep while knowing such an injury is common to a fractured humeral head, constitutes deliberate indifference to Hall's serious medical needs in violation of the Eighth Amendment rights to the United States Constitution. The same further constitutes negligence, neglect, malpractice, and prisoner abuse under Montana state law.

553. The failure of defendants Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Myron Beeson, Tom Wood, Leroy Kirkegard, Jane Lamoure, and Mike Batista to act on Hall's numerous reports and grievances of neglect and issues of complaints related to dangerous working conditions, staff negligence and neglect, and concerns for the treatment he was receiving related to his serious medical needs, violated Hall's Eighth Amendment rights to the

166

United States Constitution.  The same further constituted negligence, neglect, and prisoner abuse under Montana state law.

B.  Award compensatory damages in the following amounts:

1.  $100,000 jointly and severally against defendants Myron Beeson, Tom Wood, Alvin Fode, and Buddy Myotte for the physical and emotional injuries sustained by the plaintiff as the result of their creation of and failure to correct or remedy dangerous working conditions while subjecting the plaintiff to the same.

2.  $100,000 jointly and severally against defendants Trisdan Kohut, Jonathan Pine, Stephen Powell, and E. Shane Spears for the physical and emotional injuries sustained by the plaintiff as the result of their failure to conduct adequate medical exams of Hall's right shoulder injuries.

3.  $150,000 jointly and severally against defendants Trisdan Kohut, P.A. Fisk, Mark Henderson, Jane McMahon, Pamela Ward Monaco, Leslie Thornton, Rosanna Hengst, Dan Curran, Gutherie Lewis, Lance Griffin, Samantha Peterson, and VARIOUS UNKNOWN DOE's for the physical and emotional injuries sustained by the plaintiff as the result their failure to provide adequate medical care to the plaintiff.

4.  $50,000 jointly and severally against defendants Myron Beeson, Tom Wood, Leroy Kirkegard, Jane Lamoure, Mike Batista, and VARIOUS UNKNOWN

DOE's for the physical and emotional injuries sustained by the plaintiff as the result their failure to remedy the plaintiff's complaints of unsafe working conditions and inadequate medical care.

C.     Award punitive damages in the following amounts:

1.     $20,000 each for Buddy Myotte, Alvin Fode, Myron Beeson, Tom Wood, Leroy Kirkegard, Jane Lamoure, Mike Batista, Hiedi Abbott, Cyndy Hiner, Cathy Redfern, Tristan Kohut, and VARIOUS UNKNOWN DOE's.

2.     $10,000 each for E. Shane Spears, Jonathan Pine, and Stephen Powell.

3.     $1,500 each for P.A. Fisk, Mark Henderson, Jane McMahon, Pamela Ward Monaco, Leslie Thornton, Rosanna Hengst, Dan Curran, Gutherie Lewis, Lance Griffin, Samantha Peterson, and VARIOUS UNKNOWN DOE's.

D.     Grant such other relief as it may appear the plaintiff is entitled.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the facts stated in this Complaint are true to my knowledge, and that any facts stated on information and belief are true to the best of my knowledge and belief.

SIGNED AND DATED this _7ᵗʰ_ day of _July_ , 2016.

_Stacy M. Hall_
Stacy G. Hall

168

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **VERIFIED COMPLAINT FOR DAMAGES of HALL v. MYOTTE, et al.,** was served on the following person(s) by depositing the same into the prison legal mail system at the South Dakota State Penitentiary for delivery via U.S. Mail, postage prepaid or paid by the prison, and addressed to:

Clerk of U.S. District Court
901 Front Street, Suite 2100
Helena, MT  59601

DATED this 8²⁹ day of ᴊᴜₗᵧ        , 2016.

Stacy G. Hall

**To be completed by Notary Public:**

I hereby certify that on this day Stacy G. Hall personally appeared before me, a Notary Public of the state of South Dakota, and swears that he is the person named as having completed the foregoing Certificate of Service and that he has executed the same by his own hand and delivered the parcel noted into the prison legal mail system at the South Dakota State Penitentiary.

The Certificate of Service was SUBSCRIBED AND SWORN before me on this 8th   day of  July        , 2016.

Signature: 
Date: 07  /08  /2016
Expires: 12   /04   /20,9

BRANDON KNUTSON
NOTARY PUBLIC
SOUTH DAKOTA
SEAL   SEAL